## STATE v. E. L. LUMLEY.

No. A-10662.    March 5, 1947.

(178 P. 2d 629.)

Mac Q. Williamson, Atty. Gen., Dixie Gilmer, County Atty., and Frank Hickman, both of Tulsa, for the State.

John Connolly, Jr., and Wheeler & Wheeler, all of Tulsa, for defendant in error.

BRETT, J.   This is an appeal on a reserved question of law from a judgment of the district court of Tulsa county, Okla., S. J. Clendinning, judge, sustaining the motions of the defendant in error to suppress the evidence.

Two criminal cases, No. 11831 and No. 11832, were consolidated since motions to suppress applied with equal force in both cases, and since the facts in each were identical. In both the cases, the defendant, Mrs. Lumley, was charged with grand larceny. In the first case, she was charged with having committed on September 16, 1944, the offense of grand larceny of one kimono at the value of $75 and one string of pearls of the value of $50, or the

total value of $125, the same being the property of Mrs. Paul Pearman. In the second case, she was charged with grand larceny of one Leica camera of the value of $200; said theft is alleged to have occurred on or about February 1, 1944, the same being the property of Major Vincent F. Mulford Jr.

After a preliminary trial she was bound over to answer in the district court. Informations were filed and demurrers thereto overruled and pleas of not guilty entered to the same. The defendant filed a motion to suppress the evidence in each case, alleging an illegal search of the defendant's baggage because the officer was without a search warrant so to do and for the further reason that the defendant was not engaged in the commission of a crime in the presence of the officer.

The motions to suppress came on for hearing on March 27, 1945. The trial court sustained the motions to suppress the evidence and from that judgment this appeal is taken on the reserved questions of law. Therefore, the real question herein involved is, "Is the evidence sufficient to uphold the trial court in sustaining the motions to suppress."

In order to ascertain the true state of facts in this case, it is necessary to consider the evidence in its chronological order. It appears from the record that Mrs. Lumley, the defendant, lived at the home of Major Mulford where she was employed by Major and Mrs. Vincent F. Mulford Jr., of Tulsa, as governess and housekeeper. Great confidence was reposed in Mrs. Lumley for she was given a checking account at the bank in order to make purchases in connection with running the household. It appears further that the home of the Mulfords was undergoing some remodeling and redecoration and that for a period of three

or four weeks, Mrs. Lumley had moved over to the house of the Pearmans, where she likewise had .full charge of the Pearmans' home. During the first two or three days that Mrs. Lumley was a resident of the Pearmans' home, Mrs. Pearman testified that she commenced missing things; that Mrs. Pearman asked Mrs. Lumley about the things that she had missed and Mrs. Lumley turned the blame on other help in the house. An objection was interposed to this testimony and the same was sustained, to which an exception was raised and an explanation was made that the purpose in offering this evidence was to show the facts that the officer had and upon which he subsequently acted. This evidence was clearly admissible. Thereafter, the Mulford family and Mrs. Lumley moved from the Pearman home back to the Mulford premises and on the next day, the defendant left for Mineral Wells, Tex., on a vacation. Mrs. Lumley testified that Mrs. Mulford suggested the vacation and that J. Garfield Buell, the father of Mrs. Mulford, assisted her in making reservations and purchased a round-trip ticket for her. Mr. Buell told her to go and since she was going only for the baths, she would not need much baggage, but when she left, she took two bags and a wardrobe trunk, which aroused his suspicions.

When the Mulfords moved from the Pearmans' home, into their own home, five corrugated boxes containing personal property of the defendant were packed and moved to the new address. The record discloses that these boxes were labeled, "Personal Property of Mrs. Lumley." A few small boxes remained in the Pearman home. Mrs. Pearman opened one of these small boxes labeled, "Personal Property of Mrs. Lumley." The record discloses a state of facts, in relation thereto as testified to by Mr. Buell, as follows, to wit:

434

(Cross-examination of Mr. Buell by Mr. Gallaher)
Mr. Buell:

"Mrs. Lumley left Sunday night. Monday morning Mrs. Pearman called me up and said, 'Mr. Buell, I hate to bother you but I wish you would come out here', and I went out—and she said, 'this matter is very, very, serious',—and I went out there at the Pearmans' house and Mrs. Pearman handed me a list of the stuff as long as your arm, and she said, 'all this stuff is gone'. " Q. I see. A. And she said nobody could have taken it except Mrs. Lumley. Q. Except Mrs. Lumley. A. And she said, 'all of her things except three or four little containers have been taken over to Mrs. Mulford's house'. Q. Yes. A. And she said, 'I opened one of these little boxes and found my things in here, and here is another one of them', and I said,—she said, 'probably I had no right to, but it was tied up with a robe taken to Mrs. Lumley's room at 1792 East 27th street, and I opened that', and let's see, I can give you the list of the stuff that came out of there— Q. I don't care about the list. You have answered quite fully, Mr. Buell. * * * (Redirect examination by Mr. Hickman) * * * Q. What was that stuff that you found prior to her arrest, before the search warrant was issued? A. Well, this one box that was opened, *a brown velvet hat, white silk hat, eyelett hat trimmed with silk violets, velvet coat hangers, and a pink satin gown,* and *five yards yellow suede and four yards red suede, a rhinestone bag*—that came out of that box. Q. Now, that was whose stuff? A. That was Mrs. Pearman's stuff in her own house that had been wrapped up and marked by Mrs. Lumley, the 'Property of Mrs. E. L. Lumley', to be taken to 1792 East 27th street.' Q. In whose handwriting was that written? A. In Mrs. Lumley's handwriting. Q. Now was that the only box you went through as that time? A. That was the only box I went through at any time. There was one red wool coat there I think that had given them the first idea. Q. That was in whose house? A. That was in the Pearmans' house, that is, in the house where the Pearmans live, 1344 East 26th Street. Q. It had not yet been moved over? A. It

had not been moved over yet. He had not gotten around to it."

In view of the foregoing circumstances, Mrs. Pearman contacted Don Martindale, a sergeant of the Tulsa police force, and explained the situation fully to him; that thereafter, Martindale made application to H. E. Chambers, judge of the municipal court of the city of Tulsa, and obtained the issuance of a search warrant to search the room set apart for and occupied by Mrs. Lumley at 1792 East 27th street, the Mulford home. The search warrant was issued by the said judge to make a search for two pairs of goldhandled scissors, needlepoint chair set, one lady's brown straw hat, string of pearls, lingeries, beaded bag with oriental design, two wool scarfs, one green and one red. Thereafter, and on or about September 27, 1944, the search warrant was executed in the room set apart for Mrs. Lumley at the Mulford home and certain articles were identified at said time by Mrs. Paul Pearman as being property which belonged to Mrs. Pearman and which had been packed in cartons and labeled by Mrs. Lumley as, "Personal Property of Mrs. Lumley", and removed to the Mulford home, said property being as follows, to wit:

*Brown straw hat, felt hat, black lace hat, green hat, navy blue hat, brown silk hat, green plush hat, white straw hat, brown straw hat, dinner dress belt and buttons in rhinestone, wool scarf, veils, bag of lace, two beanies, red sweater, blue jacket, white bag, two slips, lace collar, crochet cotton, panties, and cape.* The record shows enough property was recovered to fill a steamer trunk. On the next day, while Mrs. Lumley was in Texas, the question of whether or not charges would be filed against her was discussed. However, the record discloses that Sergeant Martindale worked on the case from September 27 to October 9, 1944, endeavoring to get additional evidence. The Court re-

fused to let him testifiy in relation to any additional circumstances upon which he based his belief that a felony had been committed. Neither was Martindale permitted to testify why he believed a felony had been committed nor detail the facts upon which such a belief could be predicated. Not to permit him to do so was certainly error. That went to the very crux of the matter of reasonable and probable cause for his belief. The record further discloses that subsequent to October 9, 1944, a lot of the things that had been stolen were returned to the Pearmans from the East and particularly, Princeton, N. J.

Other than the work that Martindale was not permitted to testify about, nothing was done until on the morning of October 9, 1944.

On said date, Mrs. Lumley was to return from Mineral Wells, Tex., by train. The record discloses that Sergeant Martindale testified that he had reason to believe that a felony had been committed by Mrs. Lumley. His belief, he said, was based upon the fact that upon executing the search warrant on September 27, 1944, he found a great many things that belonged to Mrs. Pearman; that in company with Mr. Buell he went to the railway station and there, together, they met Mrs. Lumley. When the train arrived and Mrs. Lumley got off, Mr. Buell asked her for her baggage checks; that she gave him the baggage checks and then he said to her, "Now we are going to the Mayo Hotel and you are in charge of Sergeant Martindale", and Martindale said, "Yes, you go with me", and at that time she was placed under arrest. While at the depot, Mrs. Lumley said something about some of the merchandise that was gone. They left the depot and went by automobile to the hotel, and on the trip Martindale explained to Mrs. Lumley that some of the things were missing out of the Pear-

man home. Upon arriving at the hotel, they went to room No. 1008 where the defendant contended repeatedly she hadn't done anything. Martindale and Mrs. Lumley waited in the room for about 45 minutes until the baggage arrived. Mr. Buell came in and suggested that the trunk probably contained other stolen goods and he told Mrs. Lumley that he would get a search warrant to search the trunk, but Mrs. Lumley said it wouldn't be necessary. Thereafter, Mr. and Mrs. Pearman came in and Mrs. Lumley opened the trunk herself, with the aid of Sergeant Martindale, and then Mrs. Lumley said, "There they are, if there is anything in there that belongs to you", and something to the effect that, "I have nothing to hide." Thereupon, Mr. and Mrs. Pearman identified a quantity of property in Mrs. Lumley's trunk as being their property, such as *the kimono, the beads,* and a Swiss watch, as well as the *Leica Camera,* as being the property of Major Mulford, the italicized property being the basis for the said charges herein involved. Moreover, the hat Mrs. Lumley was then wearing, the evidence disclosed, was stolen from Mrs. Pearman. The record discloses that Mrs. Lumley told Mr. Buell, while at the hotel, that she wanted an attorney, to which he replied that she would "* * * get a lawyer in due course of time."

The record is conflicting as to the time spent at the hotel, but the police records, as made by the booking officer, show that Mrs. Lumley was taken to the police station and booked in at 11:55 a.m.

Sergeant Martindale made the arrest at the railway station without a warrant and said that he did not obtain a warrant for making the arrest because he believed a felony had been committed and that no warrant was necessary. Charges were not formally preferred against Mrs.

Lumley and a warrant was not issued for her arrest until the morning of October 10, 1944. The foregoing state of facts was sworn to by Don Martindale, Mrs. Paul Pearman, and J. Garfield Buell.

Mrs. Lumley testified that the reason for her arrest and detention was not to obtain stolen goods but that it was to obtain certain letters that belonged to J. Garfield Buell's daughter. The record does show that she had at one time had in her possession letters belonging to Buell's daughter and which the daughter had apparently gotten from Sister Ursula. Mrs. Lumley did not deny that when her trunk was searched they found the kimono, some beads, the camera and other things. She contended, however, that they were gifts from the Mulford and the Pearman families to her. In this testimony, Mrs. Lumley is not corroborated save and except in that she did have in her possession these articles, alleged in the information to have been stolen.

It appears from the record, largely through conversation between Mr. Hickman, for the state, and Judge Clendinning, that Mrs. Lumley had already been prosecuted for the theft of some of this property and had been acquitted. One might think from only a casual examination of the record that Judge Clendinning had heard the evidence in cause No. 11831 and No. 11832. In the record it appears that Judge Clendinning said, "I have heard all the evidence in this case; I have heard all the evidence, I tried the whole case." Notwithstanding the fact that the court was advised that the evidence was obtained from an entirely different source, he persisted in statements to the effect that he had heard the evidence in the two cases at bar. The court may have wanted it to appear that he had heard and passed upon the question herein involved in another and

different prosecution. A careful examination of the record discloses that the case that Judge Clendinning tried was not the case of the property that was alleged to have been stolen and that was found under the search warrant of the 27th day of September, 1944, but that the case that Judge Clendinning tried was based upon property scattered in the boxes and was altogether different property from that which was obtained under the search of September 27, 1944 and upon which Martindale based his belief for the arrest and search made and conducted on October 9, 1944. As proof of this fact, there is the court's admission as follows:

"Mr. Hickman: This is what I am trying to inform the court. The case you tried with the jury here was not the case of the property that was alleged to have been stolen that was found under the search warrant on the 27th day of September. The Court: That's right. Mr. Hickman: That was property found scattered in those boxes. The Court: I know where it was. I know exactly what it was."

Repeatedly, the court stated that Martindale had no right under the law to arrest Mrs. Lumley; that Martindale did not have a right to arrest this woman on a charge of grand larceny; that Martindale did not believe that she had committed a felony; that he did not believe he had a right to arrest her, and that he would be ashamed of himself if he believed such testimony; that he would not believe the whole police court records. That if an affidavit was filed and a number was assigned to it, the judge issued the warrant and the warrant was served (the one on of September 27, 1944, which is supported by the court return on the back of the search warrant and he had filed it with the clerk of the court; if all of these things were brought before him he would not believe any part of it. And, when pressed as to his sincerity in not believing the

records, he said, "not one would I believe." The court told counsel for the state repeatedly that if he brought the affidavit, the search warrant, the return and inventory, all the police records concerning the search of September 27, 1944 into evidence, he wouldn't believe them, even if they were in black and white. They were, however, brought in and are a part of the record and appear regular in every particular.

In one place, the record shows in relation to the search of September 27, 1944 which as supported by the court records and the sworn testimony, the court's attitude as follows:

"Mr. Hickman: You don't believe they found this stuff out there, your honor? The Court: I don't believe a word of it. I don't mean they didn't find, I just don't believe it. You want to hurry up with this case because I am getting in a hurry with this case. Is there anything else of this witness?"

A considerable part of the record is devoted to many such expressions of the court. In fact, a most studied effort on the part of the court is disclosed to discourage the state from making a record. Only through the stolid persistence of the state's counsel was the record finally completed. Once the prosecutor almost weakened when he said "* * * if the court won't believe these records, there is no use in bringing them into court." But he didn't weaken and we find them highly corroborative. Finally, however, after much effort, the special prosecutor put this proposition to the court:

"You know that she was placed under arrest, therefore, it becomes a question, 'did he have a lawful right to arrest her?' to which the court replied, 'that's right.' "

It is apparent that the court was laboring under some preconceived conclusion as to the innocence of the defendant upon which we do not attempt to pass in this opinion. It is evident that the court had his mind made up when the first witness took the stand. Thereafter, the court closed his eyes and his ears and opened the door of his prejudice. Under these conditions, the state's case was doomed from the beginning. But the court's admission last referred to brings us to the decisive question in the case— "Was there probable cause to believe a felony had been committed, upon which to base the arrest of Mrs. Lumley without a warrant?" All other questions are incidental, under the statutes of the State of Oklahoma.

The state contends that under the circumstances herein involved, the arrest was lawful since it was made upon the basis that there was reasonable and probable grounds to believe that a felony had been committed and that no search warrant was necessary to search the property of the defendant. The statutes of the state support this contention, Title 22 O. S. 1941 § 196, which provides:

"A peace officer may, without a warrant, arrest a person:" subsection 3, "When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it".

The foregoing section of the statute has been construed in Welch v. State, 30 Okla. Cr. 330, 236 P. 68, 70, wherein the court held:

"If a * * * peace officer arrest a person without a warrant, he is not bound to show in his justification a felony actually committed, to render the arrest lawful; but if he suspects one on his own knowledge of facts; or upon facts communicated to him by others, and thereupon he has reasonable ground to believe that the accused has been guilty of felony, the arrest if not unlawful."

In so holding, the court cited and quoted, with approval, a case decided by the Supreme Court of the United States, Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790, as follows:

"In an opinion written by Chief Justice Taft, this statement occurs: 'If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient. * * * If a constable or other peace officer arrest a person without a warrant, he is not bound to show in his justification a felony actually committed, to render the arrest lawful; but if he suspects one on his own knowledge of facts; or upon facts communicated to him by others, and thereupon he has reasonable ground to believe that the accused has been guilty of felony, the arrest is not unlawful.

" 'But, as we have seen, good faith is not enough to constitute probable cause. That faith must be grounded on facts * * * which in the judgment of the court would make his faith reasonable.' "

We believe the rule is clearly therein stated. See Luker v. State, 60 Okla. Cr. 151, 62 P. 2d 255; also, Sallee v. State, 54 Okla. Cr. 217, 17 P. 2d 520, wherein the court said:

"Where the officers have information that a felony has been committed, and where they have reasonable ground to believe that defendant has committed this felony, they may legally arrest him, and evidence obtained in a search of his premises after his arrest is admissible."

See Tate v. State, 45 Okla. Cr. 96, 281 P. 820, 822, wherein the court said, in quoting from Ex parte Finney, 21 Okla. Cr. 103, 205 P. 197:

"Where officers or others have authority to make arrests upon suspicion that a felony has been committed, to claim protection under the law there must be reasonable

and probable grounds for that suspicion. Suspicion without cause can never be an excuse for such action. The two must both exist and be reasonably well founded."

Also McDaniels v. State, 36 Okla. Cr. 313, 253 P. 1041, wherein the court said:

"Where a felony has in fact been committed, and there is reasonable cause for believing the person about to be arrested committed it, a public officer may arrest such person without a warrant."

Where an officer makes a lawful arrest, he may take from the person so arrested fruits of the crime, as was said in Washington v. State, 37 Okla. Cr. 415, at page 418, 259 P. 150, at page 151:

"We deem it sufficient to say that only unreasonable searches and seizures are prohibited. The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime, and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, or which may be of use as evidence at the trial, is not to be doubted."

McAfee v. State, 65 Okla. Cr. 65, 82 P. 2d 1006, wherein the court held:

"* * * that one legally arrested may be searched for property connected with the offense that may be used as evidence against him."

In Newton v. State, 61 Okla. Cr. 237, 71 P. 2d 122, 123, held:

"Arresting officer may take from person lawfully arrested any instrument of crime or anything reasonably deemed necessary to his own or public safety and admission of such thing or instrument in evidence against person arrested is not objectionable as obtained by unlawful search and seizure." Griffin v. State, 57 Okla. Cr. 176, 46 P. 2d 382.

In Gaines v. State, 28 Okla. Cr. 353, 230 P. 946, 947, the court said:

"One legally arrested may be searched for property connected with the offense which may be used as evidence against him, or for weapons or things that might facilitate his escape. This would apply to a search for a package of narcotic drugs thrown away by the person at the time of his arrest. State v. Wills, 91 W. Va. 659, 114 S. E. 261, 24 A. L. R. 1398, and notes."

With the foregoing principles in mind, let us examine the record.

The facts are that Mrs. Pearman had been missing things from her home; that Mrs. Lumley attempted to lay the missing articles upon some of the other help around the house; that when Mrs. Lumley made the trip to Mineral Wells, she took with her a wardrobe trunk and two bags; that when the Mulfords moved into their home, Mrs. Lumley had five (5) corrugated boxes containing what she had labeled "Personal Property of Mrs. Lumley"; that Mrs. Pearman opened one of the boxes that had not been moved from her house to the Mulford home; she found some of her property therein; that she called Mr. Buell and presented him with a long list of stuff that was gone; that thereupon they contacted Sergeant Martindale in relation to these matters; that they thereafter obtained a search warrant from the municipal court to search Mrs. Lumley's room and effects in the Mulford home; that this search disclosed some of the missing articles as well as some of the articles named in the search warrant. That the property obtained by the search warrant filled a steamer trunk; that Martindale continued to work on the case but the court prohibited him from testifying what additional evidence he had as a basis for his belief that a felony had been committed; that certain letters which Mrs. Lumley had taken had been re-

turned to them by Sister Ursula; that Sister Ursula also turned over to the police a kimono which had been sent to her from Mineral Wells, Tex., by Mrs. Lumley; that pursuant to this state of facts, the arrest was made on October 9, 1944, when Mrs. Lumley returned by train from Mineral Wells, Tex.; that upon a search being made of her wardrobe trunk and bags, the kimono, the beads, a Swiss watch and the Leica camera were found among Mrs. Lumley's effects.

Under this chain of circumstances, we are forced to conclude that the officer had reasonable cause to believe that a felony had been committed. What better reason can be ascribed for his belief than the positive confirmation of the belief as disclosed by the search—the finding of the kimono, the beads, the watch and the Leica camera? This confirmation is proof that Martindale had reasonable grounds to believe that a felony had been committed; that his belief was not merely based upon suspicion of guilt but that his belief was well founded. Had the court permitted the officer to testify to the facts and circumstances within his knowledge and upon which he based his belief, this case might not now be on appeal here, but as hereinbefore set forth, the court studiously refused such proof when offered. Under these conditions, we are of the opinion that the officer's belief rose to a higher level than a mere suspicion of guilt and reached that of reasonable grounds for such belief and therefore he had ample reason to believe that a felony had been committed and his arrest of the defendant was clearly within the statutory provision and the interpretative cases hereinbefore set forth.

The arrest being lawful, the officer had authority under the law and was clearly within his rights as an officer to make the search of Mrs. Lumley's effects in her custody

without a warrant and to thereby disclose the fruits of the crime with which she is charged. We, therefore, are of the opinion, in view of the foregoing authorities and numerous other cases we have reviewed, that the search was lawful and the property thus obtained presented evidence upon which these charges could be predicated against the defendant. Jay v. State, 37 Okla. Cr. 425, 258 P. 1060; wherein the court said:

"A person, lawfully arrested, may as an incident thereto be searched, and incriminating articles found in his possession may be seized."

See, also, Brannon v. State, 39 Okla. Cr. 207, 264 P. 835, 836, wherein this court said:

"When a person has been legally arrested, either by an officer or a private person, as an incident of such arrest he may be searched and articles found in his possession which may be used in the commission of crime or connected with the offense, or which may be used as evidence against him * * * may be seized."

See, also, Woods v. State, 37 Okla. Cr. 377, 258 P. 816. In Hammonds v. State, 73 Okla. Cr. 287, at page 290, 120 P. 2d 376, Judge Jones cited Brumley v. State, 69 Okla. Cr. 122, 100 P. 2d 465, which held as follows [73 Okla. Cr. 287, 120 P. 2d 377]:

"As an incident to such legal arrest the person and automobile of the offender may without a warrant be searched for contraband goods."

In Skinner v. State, 65 Okla. Cr. 371, 87 P. 2d 341, 343, Judge Barefoot said:

"This court has heretofore held that in connection with a lawful arrest, the officer may search the person arrested, and seize any thing found upon him, or in his immediate control; the possession of which is unlawful.

It is true that in order to justify the search of the person, and the immediate surroundings of the person arrested, the arrest must be done in good faith, and not as an excuse or subterfuge for the purpose of making an unlawful search."

In light of the foregoing facts and authorities, we are therefore of the opinion that the arrest without a warrant was lawful and the search incident thereto was lawful.

The question has been raised that the officers had ample time in which to get a warrant for Mrs. Lumley's arrest and a search warrant with which to search her effects on October 9, 1944. The record supports this contention, but we know of no rule of law that, where an officer acting on an honest belief that there is reasonable and probable grounds to believe a felony has been committed, is required to obtain a search warrant, particularly where that belief is well founded, as we believe it is in this case. We are therefore unwilling to censure the officer for not obtaining a warrant for the arrest and search of Mrs. Lumley and her baggage. The officer, of course, is allowed some latitude of discretion and judgment in such matters. The reason he gave for not so doing was a good one. He said they wanted to avoid extradition proceedings—this appears to us to be logical. In many cases where the arrest is made upon belief a felony has been committed, the course herein pursued, as to the arrest, would be not only wise but in keeping with the demands of justice. We cannot escape the fact that when the belief that a felony had been committed was established in the officer's mind, Mrs. Lumley was then in Texas. If a warrant for her arrest had been procured, she might never have returned to Oklahoma. The law doesn't require the officer to get a warrant for an arrest where he has reasonable grounds to believe that a fel-

ony has been committed. We believe the record clearly supports that conclusion in this case.

We are confronted, however, with quite a different proposition as to the disposition made of Mrs. Lumley after she had been arrested. We do not sanction the conduct of Officer Martindale nor Mr. Buell in taking Mrs. Lumley to the hotel to conduct the search, even if, as the record discloses, they thought it would be less embarrassing for Mrs. Lumley. Certainly, this conduct on the part of the officer and Mr. Buell partakes of the nature of an "inquisitorial examination", which is modernly known as the "sweat-box". Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 142, 140 P. 2d 248, affirmed, 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481, rehearing denied, 323 U. S. 809, 65 S. Ct. 26, 89 L. Ed. 645. We do not condone Officer Martindale nor Mr. Buell in denying her the aid of counsel when she requested it. She was entitled to that as well as the right to be taken before a magistrate without unnecessary delay, 22 O. S. 1941 § 181, for which the officer may be held to answer in his own proper person for willfully delaying to take such person before a magistrate, 21 O. S. 1941 § 534. When an officer takes a person into custody whom he has reasonable grounds to believe has committed a felony, he should not be taken to a hotel room and there subjected to an examination. The proper place for such examination is at the public prison or jail where such things can be conducted as by law provided, and this court does not sanction the procedure that has been pursued in this case and certainly does not recommend it as a pattern. However, we cannot say from this record that the defendant was injured or could be injured as to the result of the trial that might come from these charges, solely by the fact that she was taken to the Mayo Hotel. It may have been less embarrassing to her. In this connection, People v. Chrfrikas,

295 Ill. 222, 129 N. E. 73, 75, wherein the Illinois court said:

"Of course, the argument of counsel for plaintiff in error that Chrfrikas should not have been taken to the Hearst building by the police officer for examination by Delaney in the officer's presence is entirely sound. When a person accused of a crime is taken into custody by the public officials he should not be taken to a newspaper office or any other private building, but to a public building where persons charged with crime are usually confined, such as a police station or jail. The taking of an arrested person to a newspaper office for the purpose of making inquiries of him as to alleged offense is entirely contrary to law and should not be sanctioned, directly or indirectly, by public authorities, but we cannot say from this record that plaintiff in error was in any way injured as to the result of the trial by the fact that he was taken to the Hearst building."

We likewise so find in the case at bar, and, therefore, are of the opinion that the court committed reversible error in sustaining the motion to suppress the evidence and this cause is hereby reversed and remanded, with instructions to overrule the motions to suppress evidence and proceed with the trial of defendant.

BAREFOOT, P. J., and JONES, J., concur.