Jerry Milo BROWN, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13209.

Court of Criminal Appeals of Oklahoma.

July 17, 1963.

J. B. Champion, Jr., Ardmore, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

PER CURIAM.

This is an appeal by Jerry Milo Brown from a conviction and sentence rendered against him in the district court of Carter

County, Oklahoma, for murder committed while engaged in the commission of a Burglary of the Sooner Foods, Inc., located in Ardmore, Oklahoma. The crime was allegedly committed on December 22, 1960, by this defendant and three accomplices. This defendant obtained a severance and was tried by a jury and convicted. The jury fixed the sentence of defendant Brown at life in the penitentiary. Judgment and sentence was entered accordingly, from which this appeal has been perfected.

The facts are hereinafter briefly set forth. The record discloses that defendant Brown and three other Texans came to Ardmore, Oklahoma for the purpose of burglarizing the Sooner Foods, Inc. In addition to this defendant Brown, the conspirators were Burt Horace Mullins, Melvin Thomas Renfro, and Arnold E. Jernigan, the latter of whom was killed in the fatal burglary.

The victim for whose death this defendant was separately tried was Ardmore policeman Bobby Rudisill, also killed when the burglars were apprehended in the food store.

The defendant Brown, an allegedly self-admitted pick-up man, was in a cafe in Davis, Oklahoma, north of Ardmore, when the burglary and incidental killings occurred. Later he was picked up while in a Pontiac car on a road between Chickasaw Lake and Highway 70, east of Ardmore.

It further appears from the record that the defendant Brown was taken to the Carter County Sheriff's office, where the defendant stated he knew nothing about the case. About 8 a. m. after the incident, three Texas Rangers appeared at the Carter County Sheriff's office. Sheriff Theo Cobb turned his prisoner, Brown, over to these out-of-state officers. The sheriff also abdicated his complete authority in favor of the Texas Rangers, and then absented himself. One of the Texans stood outside the door, while the other two took this defendant inside the office and closed the door. The uncontested evidence discloses that they then removed their coats, and the following undisputed things took place (Direct examination of Jerry Milo Brown):

"Q You testify what they said there, if you recall it. A Well, Burke turned around to me and told me, said, 'You son-of-a-bitch, you better tell us what happened now, we want to know about it, and we're going to find out. We're going to know one way or another. Want you to tell this sheriff what happened.'

"Q All right. Then what happened? A I didn't answer him, and then the other Ranger came over, the one I didn't name, grabbed me by the hair of my head and pulled it down almost between my knees, pulling just as heard as he could at it. And I knowed it came out, now, I didnt know at the time it was coming out, but he was pulling awfully hard.

"Q All right. Then what heppened? A Well, Burke was hitting me on the the ears · with both hands, with his palms, slapping me as hard as he could, and hollering, 'you sorry son-of-a-bitch, I'm going to break your eardrums.' And he beat me up and down the back as I was bent over by the other ranger holding my hair I was bent over in a bending position, and he beat up and down my back with his hands.

"Q Did you see what he had in his hands? A No, sir, I couldn't.

"Q All right. What happened? Was that in the kidney region? A It was all up and down the back, from my neck on down.

"Q All right. Then what happened? A The one that had me by the hair finally pulled me out of the chair, by my hair. I was laying on the floor on my stomach. Burke grabbed one leg and started twisting it, had my foot, I believe it was my left one, and twisting as hard as he could, telling me he was going to break my leg. using foul language, I don't remember what all he said.· My mind was in pretty bad shape at this time. I do remember-

what happened, but I can't state it just exactly the way it was. I know I took a terrible beating at this time.

"Q All right, did—was there anyone else in there? As I understand it, there were no Carter County officers in there, is that correct? A That is right.

"Q And, can you remember anything else that was said to you concerning making a statement, or admission, or confession, or whatever you call it? A Yes, sir. They continued to beat me, as I was saying, and he kicked me in the back several times, kicked me with his boots, and one of them stood on my neck. I don't know which one it was, they just stood on the back of my neck, holding my head down.

"Q Stood with his feet on the back of your neck? A Yes, sir. Don't know who it—

"Q All right. A And they finally let me up, and they knew I couldn't talk in this position, and they let me back into the chair. They told me, said, 'Now, are you going to tell us just exactly the way it happened?' I told them the way it happened in my own words and they weren't satisfied with this, started whipping me again. And just beat me there in the chair, never did pull me out of the chair again, kicked me on my shins, pulled my hair, and beat me around there—

"Q Kicked you on the shins? With what? A I believe it was a boot, I'm not sure. I know it was, when I was on the floor, I couldn't see what hit me.

"Q All right. Now, what was said to you in regard to a statement? A They told me, before they left I was going to tell that sheriff exactly what they wanted me to say. They were not satisfied with what I told them and that—

"Q Well, what did you tell them? A I told them that I didn't have any knowledge of the burglary. I had no

knowledge of it whatsoever, until I had been brought to jail, and then I knew that one had been committed.

"Q All right. Was there any tension and excitement there that night among the officers? A The night I was brought in?

"Q Yes. A They were very excited. They was mad and telling me that a police officer had been killed and someone was going to pay for it.

"Q Well, what did—did they make any—after the—directing your attention to this Ranger who talked to you, what happened after that? A A—

"Q Did you ever say anything to them or did they tell you what to say? A I told them some things, but like I said, they—they just kept on beating on me and they told me what to say when the sheriff came in. They told me I'd better say it.

"Q All right. What did they say you'd better say? A They told me that—that—I'd been telling them all along when they were beating on me, that I couldn't possibly have committed the burglary because I was in Davis. And they wouldn't accept my word for this at all, and they continued to beat me.

"Q All right. A I think, possibly, they did finally accept this in their own minds, because they told me, tell the Sheriff that I was driving the get-a-way car, and that I had dropped these people off at a designated place, that I was supposed to have done that.

"Q All right. A They told me that if I did not tell this to the sheriff that I had only had a sample of what they'd do and that they would be back later to check up on me and make sure of what I had said.

"Q Did they ever come back? A Yes, sir.

"Q How do you know? A For two reasons. One day I was visiting my wife up in the front room, the visiting room in the jail there, and I saw the

Rangers' car down there and saw one of them get out.

"Q Did you recognize him? A It was Ranger Burke.

"Q All right. If I understand it, they told you that if you didn't say what they put in your mouth, is that what you're saying? A Yes, sir.

"Q I want to know exactly what they said to you, if you can remember the words. A They told me that a policeman had been killed and that somebody was going to pay for it and it was going to be me. And they wanted everybody in it, and they told me just exactly what to say.

"Q All right. Did you tell them the name of Horace Mullins, Renfro, and Jernigan? A Yes, sir, I did.

"Q What else did you say? A A—I told them the truth, but they didn't believe me, they wouldn't accept it. And they continued to beat me until they took—until they got through my head what they wanted me to say,

"Q Well, what was that? What did they want you to say? What did they tell you to say? A They told me that I had better say it, that I was driving the get-a-way car, and that I had come up here with the knowledge in my mind to commit a burglary,—

"Q Was this—were you afraid at this time? A Yes, sir. I thought for a while there when they were beating me that they might kill me. They threatened to do that several times.

"Q You mean you thought that they would kill you when you were right there in the jail? A The way they were beating me, I didn't think they cared where I was.

"Q All right. After that, did you talk to the sheriff on this case? A Yes, sir. He came into the office, and a—Burke was there, I'm not sure whether Rigor was there or not. But I know that Burke and the other Ranger were there.

"Q All right. A The sheriff sat down at the desk and a—Burke told me, said, 'Now, are you ready to tell the Sheriff what we want to know?' And I had asked for a lawyer before, and I asked the sheriff, I said, 'Is there any chance of me getting a lawyer?' And a—Rigor was there, I remember now, he hit me—came across the room and hit me in the head and told me, 'You son-of-a-bitch, *if you ever ask for a lawyer around me again, I'll kill you.' Then he turned to the sheriff and said, 'I better get out of here before I do kill him.'* [Emphasis supplied] And then he walked out the door.

"Q All right. Then did you talk to the sheriff? A Yes, sir, I did.

"Q What did you say to him? A I told him exactly what the Rangers had told me to tell him.

"Q And what was that? A That a— I had come up here with Jernigan, Renfro, and Mullins, to commit a burglary, and I was driving the get-a-way car. And I dropped them off at some school here in town, I don't remember the name of it.

\* \* \* \* \* \*

"Q Did anyone, at any time, explain that you didn't have to make a statement of any kind? A No, sir. They did not.

"Q Did anyone tell you that anything that you said could be used against you? A No, sir.

"Q Did anyone tell you that you had the right to counsel, to be taken before the judge? A No, sir."

\* \* \* \* \* \*

"Q Did you notice anything different about your body in regard to your ordinary elimination after they beat you? A Yes, sir, I did. I passed blood for several days.

"Q Did you ask anybody to get you a doctor, or get you any help? A Yes, sir, I did.

"Q Who did you ask? A I asked —I asked some of the officers around there, I don't remember who it was, but I could see I wasn't going to get any, and I finally kept after my wife until she talked to the sheriff and I finally got a doctor. * * * "

Dr. Frank Clark, duly licensed physician and surgeon, examined Brown on December 25, 1960 in the county jail. He related both defendant's eyes were blacked, that there were bruises on the bridge of the nose, the left elbow, there was a large bruise on the medial side of the calf of the right leg, on the right ear a small bruise, in and around both loins, overlaying both kidneys were large bruises on both sides, which was swollen and tender.

This record is most convincing of the mistreatment to which this defendant was subjected by the Texas officers.

In this connection Dr. Clark was corroborated by Miss Pauline Girvin, who testified she saw defendant Brown on a trip to the jail on the morning of December 23, 1960, and observed his face and back. She testified his eyes were blacked and he had scratches and bruises on his face, and large bruises on his back. The bruises in the kidney region, she said, were larger than Mr. Champion's hand.

Defendant then related that no one else in the jail knew about his condition, because he was in the "tank" by himself.

All the foregoing evidence stands uncontradicted, since at no time were the Texas officers called to refute the accusations of official misconduct laid against them.

Sheriff Cobb admitted that "the biggest part of the time" the Texas officers talked to Brown he was not there, and stated no other officer on his staff was there. He stated further in answer to the question: "Did he appear to have been mistreated in any way? A Not brutally, as Mr. Champion—" When pressed for a positive answer by the county attorney, he replied: "Well, I—I couldn't tell." He stated he heard statements from the defendant Brown, part of it while the Texas officers were present, and some of it after they had gone. As to whether he advised defendant as to why he was being held, this record shows that the sheriff testified:

"I couldn't definitely said that I—I— I just outright went through the formality of saying that 'you are charged with so and so, and that I must be —warn you that anything you may say may be held in evidence against you.' I didn't go through that proceeding, no sir."

As to whether this defendant was advised of his right to an attorney, the sheriff was equally evasive, even though at one time he said, "Yes, sir, I would say he was advised of his rights."

The sheriff did positively testify that the defendant did not make a statement in writing. The sheriff did not threaten him with harm. The Texas officers did tell the defendant they would be back and he had better tell the sheriff what he wanted to know. They told him to say, "I was driving the get-a-way car, and that I come up here with the knowledge in my mind to commit a burglary."

The defendant is also supposed to have admitted that the gun used in the burglary was his gun. These admissions, whether made to the Texas officers or the Carter County sheriff, would be governed by the rules announced in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 in that the admissions herein relied on by the State were so closely connected with the beating, that they were all tainted by the character of involuntariness. They were further tainted by the threat of the Texas officers that they would, and did, return at another time later.

The sheriff said that is what he gathered during the three hour interrogation (and beating) by the Texas officers, as he went. in and out at intervals, "it was just bits and pieces".

The sheriff admitted he heard one of the Texas Rangers say that he would kill him (Brown) and the sheriff admitted he saw some bruises on Brown's body. Never-

theless, he thought the "bits and pieces" of admissions thus obtained from Brown were voluntary. This conclusion is supported neither by the record nor the sphinxian silence and the abuse of the Texas Rangers. No effort appears on the part of the State to obtain their presence as witnesses to refute the charge laid against them of beating the accused in an effort to obtain either a confession or admission.

On this basis of the purported admissions hereinbefore contained, the jury returned its verdict and assessed the penalty of life imprisonment against the defendant Brown.

The Attorney General seeks to sustain the alleged admissions on the ground that they are not confessions, but are involuntary statements not amounting to a confession of participation in the alleged crime.

Before a determination of these issues can be disposed of it is necessary that other basic facts materially affecting the defendant's rights be set out.

The record discloses that the defendant was taken into custody on December 22, 1960 and confined in the Carter County jail. On December 30, 1960 defendant Brown was charged by complaint with the murder of Bobby Rudisill, upon which he was brought before G. W. Sparger, justice of the peace, for preliminary hearing on June 29, 1961, after which he was bound over without bond to the district court for trial, wherein on October 30, 1961 he was charged by information with said alleged crime. The said information was filed only after the defendant made petition for a writ of habeas corpus. The case finally came on for trial on November 14, 1961, verdict was rendered on November 15, 1961, and judgment and sentence entered on January 18, 1962. During all of this time, since December 22, 1960 this defendant has been confined either in jail or in the penitentiary.

There are numerous other alleged errors, but it will not be necessary to consider them to reach a conclusion herein.

■ Counsel for the defendant would have us treat the statements attributed to the defendant herein as a confession of guilt of the burglary. We do not so regard them, because they are not a confession of guilt of the burglary itself, but are inculpatory admissions (as distinguished from exculpatory) tending to connect the defendant with the crime as an accessory before and after the fact, but not as a participant in the commission thereof. Nevertheless, such inculpatory statements, the same as confessions, to be admissible, must have been voluntarily made (22A C.J.S. Criminal Law § 732, n. 63.5), and are subject to the same rules of admissibility as confessions, requiring that proof of their voluntary character be established before admitting them. 22A C.J.S. Criminal Law § 732, p. 1052, n. 75.5 and 76.

■ In the case at bar, defendant offered sufficient evidence to establish the involuntary character of the admissions herein involved. McGuire v. State, 239 Ala. 564, 194 So. 815.

And see State v. Schave, 72 Okl.Cr. 75, 113 P.2d 203, wherein it was held:

"As above stated, we do not think the court erred in refusing to admit in evidence the unsigned statement offered by the state under the facts and circumstances in this case; and did not err in refusing to permit the officers to testify that defendant had made statements to them which they had written into the unsigned statement which he refused to sign. The court came to the conclusion that the statements were not voluntarily made and that they were made under duress and were therefore inadmissible. Miller v. State, 13 Okl. Cr. 176, 163 P. 131, L.R.A.1917D, 383. In this we find no error."

■ This provokes inquiry, what is a voluntary statement? We know of no better definition thereof than that contained in State v. Clifford, 86 Iowa 550, 53 N.W. 299, 41 Am.St.Rep. 518, as follows:

"A * * * statement to have been voluntarily made, must proceed 'from

the spontaneous suggestion of the party's own mind, free from the influence of any extraneous, disturbing cause.'"

Or, as was equally well said in Culombe v. Connecticut, supra:

"The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unrestrained choice by its maker? If it is, he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

The uncontradicted evidence herein clearly requires invocation of the rule of exclusion. It falls not only within the rule of the Culombe case, supra, but within a long line of our own cases.

In Lyons v. State, 77 Okl.Cr. 197, 138 P.2d 142, 140 P.2d 248; Id., 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 it is held that the general rule as to confessions and admissions is that such statements brought about by coercive influence are inadmissible. Therein the first confession was excluded on the identical grounds asserted in this appeal, namely, that the matter was coercively obtained. The first confession therein was obtained in much the same manner as the alleged admissions were obtained herein.

As was said in People v. Hiller, 2 Ill.2d 323, 118 N.E.2d 11, "with the record in this state, the statement, or confession, of the defendant was not competent for any purpose unless and until its voluntary nature was established."

The record in this case clearly shows the involuntary character of the coerced admissions of the defendant. The burden was on the defendant to show the involuntary nature of the admissions (Guthrie v. State, 87 Okl.Cr. 112, 194 P.2d 895) and he has met that burden. Under such conditions our duty is clear. See also Benton v. State, 86 Okl.Cr. 137, 190 P.2d 168; In re Application of Fowler, Okl.Cr., 356 P.2d 770.

The coercive methods employed herein to obtain the admissions relied on conclusively established they were not admissible for any purpose. It was therefore reversible error for the trial court to admit the purported admission into evidence on any grounds.

The defendant further complains of the long delay in taking him before a magistrate, in filing the information after the preliminary, and in not according him a speedy trial, in violation of his substantial rights.

The record reveals a most flagrant violation in the foregoing regard. Defendant Brown was arrested on the morning of December 22, 1960, but was not taken before an examining magistrate until December 30, 1960. Though charged by complaint, he was not accorded a preliminary hearing until June 29, 1961. In said hearing probable cause was found, and defendant was bound over to the district court of Carter County for trial. As counsel alleges, the county attorney pigeonholed the transcript and did not file an information against defendant Brown until October 30, 1961.

The foregoing dilatory conduct of the prosecutor constitutes unexcusable delay in according defendant his rights.

Finally, on November 14, 1961 trial of the defendant was commenced in the district court of Carter County, Oklahoma.

Title 22 O.S.A. § 181, provides:

"The defendant *must* in all cases, be taken before the magistrate without unnecessary delay." [Emphasis supplied.]

A period of eight days elapsed before the defendant was taken before a magistrate. Such delay could amount to a denial of a

substantial right, but no such deprivation has been established by this record. The burden is on the defendant to establish prejudice by reason of the delay. In the case of In re Dare, Okl.Cr., 370 P.2d 846, a delay of 33 days was held not to be prejudicial under the circumstances. Each such case must depend on its own facts. Application of Fowler, supra; Benton v. State, 86 Okl.Cr. 137, 190 P.2d 168.

■ This Court has held that the foregoing statute relative to taking defendant before a magistrate without unnecessary delay should be strictly followed. In State v. Lumley, 83 Okl.Cr. 430, 178 P.2d 629, it was held that it was improper not to afford the defendant such right.

However, the delay of eight days does not appear to have prejudiced the defendant herein. But the delay in charging him by information and not affording him a speedy trial presents a serious deprivation. Art. II, § 20, Okl.Const. provides:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed * * *."

Title 22 O.S.A. § 811 reads:

"When a person has been held to answer for a public offense, if an indictment or information is not filed against him at the next term of court at which he is held to answer, the court must order the prosecution to be dismissed, unless good cause to the contrary be shown."

And 22 O.S.A. § 812 provides:

"If a defendant, prosecuted for a public offense, whose trial has not been postponed upon his application, is not brought to trial at the next term of court in which the indictment or information is triable after it is filed, the court must order the prosecution to be dismissed, unless good cause to the contrary be shown."

These sections, and sections 264, 811, 814, 817 of Title 22 have all been held to constitute legislative construction for definition of constitutional requirement for speedy trial (Art. II, § 6, 20 Okl.Const.) McLeod v. Graham, 6 Okl.Cr. 197, 118 P. 160; Jordan v. Phillips, Okl.Cr., 344 P.2d 600; In re Gregory, Okl.Cr., 309 P.2d 1083.

In the case at bar part of one term and most of two other terms expired before the defendant was brought to trial. No good cause for the delay in failing so to do has been established by this record. The conduct of the county attorney in this situation stands void of satisfactory explanation.

■ The Attorney General contends that the defendant made no demand for a speedy trial. The answer to this argument is that the defendant being in jail, held without bond, the law makes the demand for a speedy trial. In re Gregory, supra, and cases cited therein. There it was further held that "there is no hard and fast rule for determining the question as to what is meant by the term 'unless good cause be shown' * * * it becomes a matter of judicial determination under the facts and circumstances in each particular case."

Nevertheless, the burden is on the State to show good cause, and neither the State's silence nor a judicial reprimand is a substitute for evidence of good cause. Quoting from In re Gregory, supra, this Court said:

"Our founding fathers, steeped in historical example of abuse of power, were unwilling to rest the safeguards of the Bill of Rights alone to the uncertainties of judicial fervor which sometimes falters or may fail in the protection of sacred rights. Instead, they insist that these rights be spelled out in black and white in the Bill of Rights. United States Constitution Sixth Amendment, and in Article 2, Sections 6 and 20, Oklahoma Constitution, which do not require a lawyer to interpret. Then, to make doubly sure, Oklahoma's Founders by legislative action spelled out definitive limitations in 22 O.S.A. § 812 to the right to a speedy trial, apparently to relieve it of elasticity and prevent relaxation of its true

meaning through judicial interpretation. All this they did in order that the right to speedy trial might not be frittered away and the citizen made a pawn of dictatorial government and a slave of despotic police action. Through sacrifice and bloodshed, the precious Bill of Rights was won. Jealously, these rights have been guarded through the years. To their perpetuation both judges and the laity should assert themselves with increased devotion for therein lies the security of free men in America; men who are masters of the State and not slaves of despotic power.

"We are tempted to say more, but the record speaks most abundantly of the official derelictions in the case at bar, and anything further would be an anti-climax. It is sufficient that we observe a situation of unwarranted delay. * * *."

The same applies in the case at bar, not only in the delay in filing the charge herein by the County Attorney, but in setting the same for trial, preceded by official abdication of the sheriff in favor of the three Texas tormentors, who beat and abused the defendant, so they say, into making admissions connecting him with the crime. The inadmissibility of such evidence has been condemned so many times by this Court that only official ignorance or cowardice would countenance it. Neither of which this Court confesses.

■ For all of the foregoing reasons, we are of the opinion that defendant was not accorded due process and this conviction is reversed, and the case is remanded with directions to dismiss.

It is so ordered.

The Court acknowledges the aid of Supernumerary Judge JOHN A. BRETT in the preparation of this opinion. After a tentative opinion was written, the cause was assigned to a judge of this Court. Thereafter, upon report and consideration in conference, the foregoing opinion was adopted by the Court.

BUSSEY, Presiding Judge (concurring).

I am in accord with the decision that this case should be reversed and remanded with instructions to dismiss.

In arriving at this conclusion, I am of the opinion that the unlawful and lawless methods employed by the Texas officers render inadmissible the inculpatory admissions of the accused, and that the admission of such statements constitutes reversible error.

I wish to further observe that there is nothing in the record which casts a reflection upon the honesty, integrity or devotion to duty of either the trial judge, county attorney, or of the sheriff of Carter County.

This case should serve as a lesson to all Oklahoma enforcement officers that they should carefully observe the questioning of any prisoner in their custody by officers from without this Jurisdiction. Had this precaution been taken and the inculpatory admissions of the accused freely given, the constitutional requirements of due process would have been satisfied and the ends of justice better served.

As I perceive the order that the charges pending be dismissed, I am of the further opinion that if the county attorney of Carter County is of the opinion that sufficient evidence exists (after excluding the exculpatory admissions of the accused), there is nothing to prevent the filing of the new information against the accused.