## ORBIE GUTHRIE v. STATE.

No. A-10849. June 9, 1948.
(194 P. 2d 895.)

Cargill, Eagleton & Cargill, Laynie W. Harrod, Sid White, and Jess L. Pullen, all of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J.  The defendant, Orbie Guthrie, was charged by an information filed in the district court of Oklahoma county with the crime of murder, was tried, found guilty by a jury of manslaughter in the first degree, who left the punishment to be fixed by the court.  The court thereupon sentenced the defendant to serve a term of 20 years' imprisonment in the State Penitentiary, and he has appealed.

The defendant, a blind man, was alleged to have shot and killed his former mother-in-law at her home at 915 East Park street, Oklahoma City, Okla., on March 21, 1946.

The daughter of the deceased, Katherine Hickman, was also blind.  She and the defendant had met, and after a courtship lasting several weeks, were married.  At the time of their marriage, Katherine was operating a confectioner's stand on the first floor of the State Capitol Building.

Prior to their marriage, the defendant had worked at various jobs, but his principal profession was that of a piano tuner, and he had worked a considerable time for a music store in Oklahoma City.

At the time of the marriage of the defendant and Katherine Hickman, according to defendant, they decided to engage in business together and each contributed money for the purpose of financing the business.  Several weeks after the parties had pooled their money, they commenced to have arguments concerning the handling of their finances.  Shortly thereafter, Katherine obtained a divorce from the defendant.  It was just a few

weeks after the divorce was granted that the fatal tragedy occurred.

Katherine Hickman testified for the state that she was divorced from defendant on January 28, 1946; that she and her mother, Mrs. Elizabeth Hinds, the deceased, were living at 919 East Park street, on March 21, 1946, and had been living there approximately three years; that about 7:30 p. m. on March 21, 1946, she had washed her hair and was sitting in the bedroom with her mother listening to the radio; that about 8 p.m., the door bell rang and her mother went to the door; that her mother shortly returned and told her that the defendant wanted to speak to her; that when she and her mother entered the front room where the defendant was standing, she heard her mother say, "I will take your hat Orbie"; that the defendant said, "Sit down Mother Hinds, I want to talk to you too"; that her mother sat down in the chair at the end of the divan; that the defendant sat on the divan and she, Katherine, was seated diagonally across from him; that the defendant inquired about how her business was getting along and about the health of some of the members of the family; that defendant then said. "I talked with a psychologist the other night in the hotel and he said the main trouble with you (addressing Katherine) is fear, you are afraid of losing your stand"; that the defendant further said that he had spoken to the psychologist about Mrs. Hinds' experience of getting a divorce, and the psychologist told him that might have had some bearing on the fact that she, Katherine, sued him for a divorce; that Orbie then talked on about what their agreement had been concerning putting a piano shop in the back yard after their marriage; that she said, "Yes, that was our agreement but mother was gone all summer because of her illness and when she return-

ed you and I were not getting along well, so she didn't go ahead and talk about putting the piano shop in the back yard as she promised"; that the defendant then said, "That is a lie," and she said, "No, Orbie, it isn't a lie"; that she then commenced crying; that she told Orbie that since their separation she had not had nervous spells; and that she was much better off; that during this conversation her mother had sat there and did not say anything; that Orbie then wanted Katherine to pay him the money which he claimed she owed him; that she said, "Orbie, you know I don't owe you any money"; that the judge said she did not owe him any money; that they continued to talk about the money which Orbie claimed she owed him and which she denied owing; that Orbie then said, "Now I guess you know I left everything for you"; that she then heard a quick movement and a shot, and a scream from her mother; that she jumped and ran to where her mother was and put her hand on her chest and felt blood; that she commenced to scream; that defendant fired another shot and she, Katherine, ran out on the porch screaming; that she ran over to her neighbor's house crying "Orbie shot my mother, someone go help."

On cross-examination, the witness repeated in more detail the background of her acquaintance with the defendant, and a more detailed explanation of their financial affairs. The witness further testified that during the time she was discussing a divorce with Orbie, she offered to go with Orbie and live in an apartment separate and apart from her mother, if Orbie would go into business and take care of the expenses of the apartment, so that she could help her mother out of the money she earned at the cigar stand at the Capitol Building. The witness further stated that after the divorce had been

granted, the defendant called her frequently and mentioned an alleged agreement pertaining to the income from the cigar stand. She denied that defendant in a conversation with the deceased just shortly before the killing had asked her about the payment of the money, and further denied that the deceased said: "We are not going to pay you anything," and she denied that defendant then said, "Well I am going to see you in court." She denied also that her mother came across the room, and denied that defendant had started to leave. She further said that after the first shot was fired, her mother had taken about three steps toward the door before she fell. On re-direct examination she stated that the money which defendant claimed she owed was for work which he claimed he had done at the Capitol cigar stand.

George Lipe, assistant county attorney, who was a former member of the Federal Bureau of Investigation, testifed that he talked to the defendant about 10 p. m. the night of the homicide in the office of the chief of detectives; that in this conversation the defendant said he was 42 years of age and had married Katherine Hickman in 1945; that after their marriage they were unable to get along together and they had been divorced in Oklahoma county in January, 1946; that defendant said during part of the time they were married, Katherine's mother had been here and had gone away from their home because of illness; that after the mother returned he and Katherine had marital difficulties which led to their divorce; that after the divorce he had had some controversy with Katherine concerning the settlement of property involved at the cigar stand at the Capitol Building; that defendant claimed he was entitled to $800 as a result of work he had performed at the stand; that he called Katherine on Sunday prior to the shooting on Thurs-

day on the telephone and talked to her about it; that on
the night of the shooting, the defendant said he left a
secondhand store which he had been operating in Okla-
homa City, went to the cafe to eat and then took a taxi
to the home of Katherine and her mother; that when he
knocked at the door, Mrs. Hinds invited him in; that
Mrs. Hinds called Katherine and told her that Orbie
was there; that Mrs. Hinds lighted the fire in the front
room so that Katherine could dry her hair in front of
the fire; that Mrs. Hinds started to leave the room and
defendant told her to sit down as he wanted to talk with
her and Katherine together; that Mrs. Hinds sat down
in a chair to defendant's left; that defendant was sit-
ting on the divan and Katherine was seated diagonally
across from him; that Mrs. Hinds was to left of de-
fendant and Katherine was to left of Mrs. Hinds; that
they had a casual conversation for a few minutes and
then they commenced a discussion of the controversy
over the settlement of the financial affairs; that Kath-
erine said the court had made an order in the case that
she did not owe him anything; but that if the court found
she owed him any money she would pay him; that he
then said to Katherine, "Well if that is the way you feel
about it, I will see you in court"; that defendant then
said he thought he heard Mrs. Hinds get up out of her
chair and thought he heard her say that she would kill
him or something to that effect; that he then pulled a
gun from his pocket, pointed it at Mrs. Hinds and fired;
that he fired the gun four times, after which his mind
went blank; that he heard Katherine screaming out on
the front porch or in the yard; that after the first shot
was fired Mrs. Hinds said, "Don't do that"; that he then
walked to the telephone and called the police.

R. A. Stevens, police officer, testified that he received a call to go to 915 East Park; that when he arrived at the house, there was a woman lying in the door with her feet out the door and her head back inside; that when he stepped in there were two men standing facing the wall; that one of the men said the other had a gun, and he ran his hand in the defendant's overcoat pocket and pulled out a 32 Caliber pistol and emptied the pistol of four empty shells, and one full one; that the empty shells were still warm; that Officer Newton who accompanied him said, "Who did the shooting," and the defendant said, "I did"; that the deceased was lying on her face and stomach and her dress was on fire and smoking under the right shoulder and Officer Newton put out the fire; that the deceased appeared to be a woman about 5' 7" and of medium size.

G. T. Newton, a policeman of Oklahoma City, testified that he arrived at 915 East Park about 8:45 p. m.; that as he stepped into the house he saw a woman lying in the door; that he inquired, "Who has got the gun?" and defendant said, "It is in my right-hand coat pocket"; that Officer Stevens took the gun out of defendant's pocket; that he saw the dress of the deceased on fire and he put out the fire with his hand.

On cross-examination he said that later, in a conversation with the defendant, the defendant said that the deceased whispered something and he thought she said she was going to kill him; that he noticed powder burns where the dress was burning on the back of the dress.

On re-direct examination he said that the statement of the defendant about the whispering occurred at the Detective Bureau.

120

J. M. Swafford, official police photographer, identified certain pictures which he had taken the night of the tragedy immediately after the police were notified. These pictures were admitted in evidence. One of the pictures was of the screen door showing a bullet hole in the screen; another was of the body of the deceased as it lay on the floor. There were ten of these pictures and with the exception of Exhibit No. 5, they were each admitted in evidence without any objection from counsel for defendant. Exhibit No. 5 was an enlarged picture of the head of deceased showing a deep scalp wound in the top of her head which had apparently been inflicted by some blunt instrument. Around the wound the hair was matted because of the coagulation of blood. The officer further testified that two bullets had entered the body of the deceased; one of which had entered back of the right shoulder and one in the breast. One of the bullets had entered from her back and was just under the skin near her breast; this bullet was lodged there, the other bullet which was recovered was taken out of the screen door.

The undertaker testified that there were two bullet holes in the body of the deceased; one in the center of the chest, and the other near the right shoulder. He further testified that the deceased was rather large, in his opinion about 5′ 8″ and would weigh about 160 pounds.

The policeman was recalled as a witness for the defendant and testified that in his opinion the pistol used by the defendant would have had to be held within three to six inches of the deceased to have produced the powder burns and set fire to her clothing which he found.

The defendant testified that he was 42 years of age and totally blind; that he lost the sight in one of his eyes at the age of four and the other at the age of twelve; that

he attended the State School for the Blind at Muskogee for thirteen terms and learned the profession of piano tuning and repairing; that he also learned to type and make brooms; that he graduated from the school in 1924; that thereafter he worked for various piano companies in Altus and Frederick, Okla., Wichita Falls, Tex., and also worked in a broom factory; that he then operated a rubber mat factory or shop for about five years in Texas; but later he went into the secondhand business where he handled radios, phonographs, electrical equipment, and guns of all kinds; that he was operating that business when he met Katherine Hickman in 1944; that he had several dates with her and they were married on April 7, 1945; that before their marriage, he and Katherine made definite plans to build a shop at the rear of her home at 915 Northeast Park; that they intended to buy and sell pianos at this shop and repair and rent them; that they talked to his mother-in-law relative to those plans and they met with her approval. The defendant then gave a detailed statement concerning his financial transactions with Katherine Hickman and her mother; that he lived in the home with Katherine Hickman and her mother; that he and Katherine had agreed to pay her mother $100 per month to take care of the expenses; that on May 20, 1945, Mrs. Hickman left the home to go to consult a specialist about her health and and was gone until about August 25th, that during the period that Mrs. Hickman was gone, the defendant worked at the cigar stand in the Capitol Building every day; that during the fall of 1945, Katherine commenced to complain about being short of money and that he commenced to work at the Jenkins Music Company; that he used part of the money which he earned to buy Christmas presents for Katherine and her mother, and put part of the money back into the cigar stand; that he and Kath-

erine got to arguing one night over the finances and that Katherine told him she was going to get a divorce; that Katherine went to a lawyer the next day and at her request he went to the lawyer's office to discuss the divorce proceedings; that when he arrived at the office, Katherine and her mother were there; that the petition was read to him but he refused to sign a waiver unless they would work out a settlement with him on the work he had done and divide the profits of the stand; that finally Katherine and her mother promised him that if he would not contest the divorce that they would make a settlement with him just as quickly as they could get around to it; that he then signed the waiver; that after the divorce was granted he called Katherine over the telephone every two or three days but that she was very nervous and he did not talk to her too much about it; that he went back into the secondhand business and was operating this business at the time of the alleged homicide; that he talked to her on Sunday and asked if she and Mrs. Hinds were feeling well enough to discuss the settlement and Katherine said, "I am not going to pay you, and my mother is not going to pay you," to which he replied, "I am going to give you a week to make up your mind, and if you don't make a satisfactory settlement, I am going to put it back into court"; that the next morning mother Hinds called him and asked if could come out and talk about the settlement and he told her he was taking inventory of his stock and could not be out until Wednesday or Thursday; that on Thursday he closed his place of business at 7 p. m., went by the cafe and drank a cup of coffee, and then rode in a taxicab to the residence of the deceased; that the 32 Caliber Smith and Wesson pistol which he carried with him that night was one he had been carrying back and forth from his room to the store since he had opened his place of

business; that he rang the door bell and mother Hinds invited him in; that he sat down on the east end of the divan; that Katherine and her mother came in together and the mother left the room; that he called the mother to return and told her that he wanted to talk to them both together; that Katherine was sitting north from him and Mrs. Hinds was sitting north and west from him; that Katherine told him that, "We have decided we are not going to pay you anything unless the court says so"; that he turned to mother Hinds and said, "What do you say about this," to which she answered, "We are not going to pay you one cent"; that he then reached for his hat and said, "I will see you in the courtroom"; that he heard Mrs. Hinds get up, take two or three steps towards him and she grabbed him by the hair and started jerking him; that Katherine said, "Mother don't do that"; that he arose from the divan and Mrs. Hinds kept jerking him back and forth; that he reached for her right hand to see what she had in it but could not catch her hand; that he thought she had a knife and was going to cut his throat or was going to knock his head off; that he happened to think about the gun in his pocket and pulled it out; that he then heard a report and everything seemed to be going on; that the next he recollected was that he heard Katherine on the outside of the house screaming "Mother, Oh God, mother"; that he did not realize that he had pulled the trigger until he felt of the barrel of the gun and smelled gun powder; that he then went to the telephone and called the police and told them to come out; that he remained in the room until the police arrived and took him to the police station.

After a short recess, the defendant was recalled to the stand and upon being asked by his counsel whether

Mrs. Hinds made any statement as she crossed the room towards him, he said, "Mother Hinds said in a hoarse whisper 'I am going to kill you for that.'"

On cross-examination he said that if he shot Mrs. Hinds it was an accident, as he did not intend to fire the gun but pulled it out of his pocket to scare her. On cross-examination, upon being asked whether he recalled firing the gun in the direction of the door, he answered, "I know my intentions was to fire it at the floor and get out of there, but what happened I don't know."

The defendant further testified that he employed Mr. Whitten, attorney of Oklahoma City, to check the divorce papers for him before he signed the waiver, and admitted that he did not tell Mr. Whitten, his attorney, or Mr. Cheek, who was attorney for his wife, that Katherine or her mother either owed him any money. No other evidence was offered on behalf of defendant.

In rebuttal, Katherine Hickman testified that she did not hear any scuffle between her mother and the defendant or anyone else before the shot was fired and stated, "There wasn't time for anything."

George Lipe testified that at the time he took the statement from the defendant at the police station the night of the killing, the defendant did not at any time state that the deceased ever took hold of his hair and pulled it, nor did he use any words to that effect.

It is first contended that trial court erred in refusing defendant's requested instruction No. I, which reads as follows:

"You are instructed that if a person is assaulted in such a manner as to produce on the mind of a reasonable person a belief that he is in actual danger of los-

ing his life or suffering great bodily harm, he will be justified in defending himself, though the danger is not real, but only apparent, and such person will not be held responsible criminally if he acts in self-defense from real and honest conviction as to the character of the danger, induced by reasonable evidence, though he may be mistaken as to the actual extent of the danger.

"In determining whether or not the defendant had reasonable cause to apprehend or fear death or great bodily harm at the time and place here in question, the jury should, as far as possible, place themselves in the position occupied by the defendant at that time, and view the facts and circumstances of the case from the standpoint of the defendant and as they reasonably appeared to him, and if, after so doing, you entertain a reasonable doubt as to whether or not, at that time, he had reasonable grounds to apprehend or fear death or great bodily injury, and in good faith acted upon that apprehension, you should resolve that doubt in favor of the defendant and acquit him".

This requested instruction contains a substantial statement of the law pertaining to the plea of self-defense interposed by the defendant. However, the trial court in instruction No. 12 gave a lengthy statement of the law pertaining to the plea of self-defense. This one instruction covers four pages in the record. In it the court repeatedly advised the jury that they should view the circumstances "from the standpoint of the defendant" and again the court stated in the instruction:

"Now, what constitutes a reasonable cause for such belief? A reasonable cause for such belief is such an overt act or demonstration made by the deceased, at the time of the fatal difficulty, which, considered in the light of all the facts and circumstances then existing and known to the slayer or *by him believed to be true,* would create in the mind of a reasonably prudent and cautious person *in like situation,* an honest belief that the deceased then and there intended to kill him or in-

flict great bodily injury upon him, and that it was necessary to kill the deceased in order to avert such threatened danger to himself. What acts or demonstrations do or do not constitute such reasonable cause, and whether or not any were made, are all questions of fact to be determined by the jury upon a consideration of all the facts and circumstances in evidence before you.

"The jury are instructed, therefore, that if they believe from the evidence in this case beyond a reasonable doubt that the defendant, Orbie Thomas Guthrie, shot the said Elizabeth Hinds with a revolver or other deadly weapon and thereby killed her, but, should further believe that the deceased, Elizabeth Hinds, without this defendant having sought the difficulty or having voluntarily entered into it, or having wilfully provoked it, assaulted the defendant, or attempted to assault the defendant, in such manner and under such circumstances as would cause a reasonable person *situated as was the defendant at that time,* to honestly believe that he was in immediate danger of being killed or of receiving great bodily injury at the hands of the deceased, and that the defendant, *under said circumstances,* for the purpose of averting such apprehended injury to himself, and not in the spirit of malice or revenge, inflicted the fatal wound upon the deceased, *having reasonable cause to believe and honestly believing that it was necessary for him to so act for the preservation of his own safety,* then and in that event, the killing would be justifiable and it would be your duty to acquit this defendant. And if, after a consideration of all the evidence, facts and circumstances in this case, you have a reasonable doubt as to whether or not that state of facts *existed on that occasion,* then, you should give the defendant the benefit of the doubt and acquit him.

"It is not necessary to this defense that the defendant's danger should have been actual or real, all that is necessary is that the defendant, *from his standpoint,* under all the circumstances in the case had reasonable cause to believe and did honestly believe that fact. Wheth-

er or not the defendant had reasonable cause for such belief and honestly entertained such belief and acted under the influence of such beliefs is a question of fact for you to determine under the evidence in the case, viewing the matter as it would reasonably appear to the defendant at that time."

In the recent case of Geyman v. State, 86 Okla. Cr. 348, 192 P. 2d 707, 708, this court stated:

"It is not error to refuse requested instructions which are proper statements of law when such requested instructions are substantially covered by the instructions given by the court."

To the same effect is the case of Osborn v. State, 86 Okla. Cr. 259, 194 P. 2d 176:

In discussing this proposition, counsel dwells upon the handicaps of a blind person and states that he should not be treated as a person who has the sense of sight. In the motion for a new trial on the ground of newly discovered evidence, there is attached to the motion the statement of two eminent doctors who relate the handicaps of those afflicted by blindness and how they depend on their sense of hearing.

We who have no physical handicaps, at least to the extent of being deprived of the sense of sight, find it difficult to place ourselves in the position of the defendant. The defendant was entitled to be tried by a jury of his peers, but that does not mean that he is entitled to be tried by a jury of twelve blind men. In fact, our statutes pertaining to the qualification of a juror prevents a person serving on the jury who is afflicted with a bodily infirmity amounting to a disability. 38 O. S. 1941 § 10. The defendant had a legal right and the trial court allowed him to detail at length the various sensations which he sustained and the impressions which were

made upon his mind which caused him to think he was about to be assaulted by the deceased. It so happened that the first story of the fatal encounter related by defendant and the physical facts refuted much of the defendant's testimony. In instruction No. 12, the jury was correctly instructed that they must place themselves in defendant's situation and view the circumstances as they reasonably appeared to the defendant at the time the fatal shot was fired. More than that was not required. The defendant was not convicted because the jury was improperly instructed. The jury just didn't believe the testimony of defendant. Undoubtedly, his blindness caused them to find him guilty of the lesser offense of manslaughter instead of the more serious offense of murder.

The writer has had the pleasant experience of long acquaintance with a few men who were blind, but who in spite of their physical handicap were cheerful and who could perform almost unbelievable feats. It seems to be quite true as argued by counsel for the state that the loss by a human being of one of his senses causes the remainder of the senses to be more keenly developed in order to help the individual replace the lost sense. Only recently the Oklahoma newspapers carried a feature story concerning one Tom Hopkins, a resident of Paden, who was totally without vision, but was widely known because of his success as a hunter and trapper. His sense of feeling and hearing had become so acute that it is said he often killed wild game with his rifle which his dog had treed. The writer of this opinion was reared in the same county with Hopkins and is familiar with many of the remarkable things that he could do with a gun. The writer has had the pleasure of fishing with a blind man and was amazed at the way he cast his

lures in the right spot where there were no bushes to entangle him.

With some limited knowledge of these apparently uniform characteristics of the blind, of having the remainder of their senses more highly developed, we have endeavored to place ourselves in the position of the defendant at the time of the fatal difficulty and view the situation as it then appeared to him. Some jury of twelve men had to determine the guilt or innocence of the defendant. He had able counsel. It was the function of the jury to determine this question. However, counsel for defendant insisted that the punishment assessed the accused was excessive and for that reason we have given this question the utmost and careful consideration, and have endeavored to view the circumstances as best we could from his standpoint to see whether the punishment inflicted by the trial court was manifestly excessive.

The deceased was shot once in the front of the body and once in the back. Either shot would have been fatal. She was struck a severe blow upon top of the head and the physical circumstances point to the fact that she was struck on the head by the pistol of the defendant. It is unlikely that defendant would have been carrying a gun if he did not know how to use it, or was not convinced in his own mind that it would be a protection to him in time of danger. If the defendant had the intent of killing his mother-in-law, he could not have placed his shots more effectively, and the place where he struck her with his gun would indicate that he had the design of causing her death. After the shooting occurred, the defendant walked to the telephone without assistance and dialed the police number and calmly waited in the room with the deceased until the police arrived.

We cannot escape the conclusion that defendant blamed his mother-in-law for the friction which had arisen between him and his wife, and that by reason of his failure to secure satisfactory replies to his questions, he became very angry and chose to destroy the one he felt was causing his trouble. The location of the death wounds strongly indicated that defendant knew exactly where he was firing.

Counsel for defendant contend that the court erred in admitting the evidence as to a confession of the defendant made to the witness Lipe. No objection was interposed to the testimony of the witness Lipe, and there was no evidence in the record, including the testimony of the defendant himself, which was given in his behalf at the conclusion of the state's case which would indicate that the statement given to Lipe was involuntary.

In the case of Carr v. State, 85 Okla. Cr. 429, 188 P. 2d 705, this court held:

"The object of admitting a confession in evidence is to obtain truth, and the only ground on which it is rejected is that the circumstances under which it is obtained have a tendency to falsehood, and that therefore the object is likely to be frustrated.

"Prima facie any confession is admissible in evidence, and burden is on defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless state's evidence tends to show that fact."

Since there was no contention presented at anytime during the trial that the statement given to Lipe was involuntary, no proof was offered on that issue and this assignment of error cannot be sustained.

In the brief of the defendant it is stated that the court erred in admitting prejudicial photographs in evi-

dence and further erred in admitting in evidence the clothing worn by deceased. No authority is cited to sustain this contention. As hereinabove stated the photographs with one exception were admitted without objection.

In Cannon v. State, 60 Okla. Cr. 167, 62 P. 2d 657, it is held:

"It is not error to permit the jury to see the clothing worn by the deceased where the defendant pleads self-defense, and the clothing proves or disproves his contention."

For other cases sustaining the admissibility of the clothing and photographs, see: Dobbs v. State, 39 Okla. Cr. 368, 264 P. 661; Cooper v State, 61 Okla. Cr. 318, 67 P. 2d 981; Jackson v. State, 67 Okla. Cr. 422, 94 P. 851.

The statement in the brief of defendant that the court failed to give an instruction on defendant's theory of the case may not be sustained. The comprehensive instruction (No. 12) hereinabove discussed pertains to the defendant's theory and gives a correct statement of the law concerning it.

Several months after the conviction of defendant, there was filed a motion for new trial on the ground of newly discovered evidence, which motion alleged that no person learned in psychiatry appeared as a witness in the trial of the case, and therefore the judge and jury could not have known the distinction between the appearances to this defendant and a normal individual; that the defendant has been examined by two learned doctors who will testify if permitted at another trial to the distinction between the sensations felt by a blind person from that of a normal individual. We have hereinabove

mentioned this motion for new trial in discussing proposition No. I.

We have a high regard for the opinion of the two doctors whose statements are attached to the motion for new trial and we have carefully read these statements.

Waiving the question as to the meritorious contention of counsel for the state that the defendant failed to allege in his motion the necessary essentials in a motion such as this, explaining his reason for not having the witnesses in attendance at the trial, we pass to the merits of this proposition. The statements of the doctors can be summarized by quoting from the conclusion of Dr. Hugh M. Galbraith's statement:

"This man has always been blind and his childhood experiences were such that he never was able to attain a feeling of security that one similarly handicapped might attain. However, he has done well in making a good living throughout his life and for the most part has kept out of trouble. His unfortunate experiences with his wife and his mother-in-law were such as to disturb anyone and his fearfulness in relation to his urge toward self-preservation was exaggerated by his blindness. He had previously shown tendencies to react violently but not often. Under the circumstances it would seem that if his story is true that his mother-in-law attacked him first, the murder should be considered as an act of self-defense."

Even if these doctors had been present and had testified on behalf of defendant to the above statement, we cannot conceive how any reasonable jury, with due regard for their oath of office, could fail to find the defendant guilty under the evidence presented by this record. The location of the death wounds, the deep scalp wound, the blood on the divan, the location of the body of the deceased, all irresistibly point to the conclusion

that the killing was unjustified upon any theory. The evidence pertaining to the deceased indicates that the deceased was not a person who was likely to assault the defendant in the manner which he claims he was assaulted. This part of the story to a reasonable person appears to be a fabrication. Evidently, the jury so considered it; otherwise, they would have found the defendant not guilty.

Since all of the statement of the doctors is based on the hypothesis that the deceased said to defendant, "I am going to kill you," then such evidence if given on another trial would not affect the outcome of the case, because the jury found from all of the facts in the case that no such statement was made by the deceased.

The defendant was fairly tried. A careful examination of the record reveals no substantial errors. The instructions, considered as a whole, seem to be fair and are as favorable to the defendant as the law requires. The sentence of 20 years' imprisonment in the penitentiary does not appear excessive.

The judgment and sentence of the district court of Oklahoma county is accordingly affirmed.

BAREFOOT, P. J., and BRETT, J., concur.