## JOSEPH HOUSTON BROWN v. STATE.

No. A-4057.    Opinion Filed July 24, 1923.
(216 Pac. 944.)

(Syllabus.)

1.   **Homicide—Law of Self-Defense Stated.**   In order to justify the killing of a human being on the ground of self-defense, it must appear that the defendant acted under a reasonable belief that he was in imminent danger of death or great bodily harm from the deceased. However, it is not necessary, in order to justify on the ground of self-defense, that the danger should have been real or actual, but the circumstances must be such as to create a reasonable belief in the mind of the defendant that it was necessary to kill the deceased in order to save his own life, or protect himself from great bodily harm, and in judging of the danger the circumstances must be viewed as they appeared to the defendant when he killed the deceased.

2.   **Trial—Sufficiency of Instructions as a Whole.**   Where the instructions of the court, considered as a whole, fully and fairly present the law of the case and are not inconsistent, they are without error.

3.   **New Trial—Insufficient Grounds—Separation of Juror—No Showing of Prejudice.**   The fact that a juror in a capital case became separated from his fellow jurors at a recess during the trial, and left the custody of the officers who had the jury in charge, is not sufficient ground to grant a new trial; where it does not appear that he had any communication with any one concerning the cause, either directly, by conversation, or indirectly, by overhearing the observations of others, or that he did any act inconsistent with his duty as a juror during such separation.

Appeal from District Court, Bryan County; Geo. S. March, Judge.

Joseph Houston Brown was convicted of manslaughter in the first degree, and he appeals. Affirmed.

W. E. Utterback, D. S. MacDonald, and Wm. S. Murphy, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

DOYLE, J. Joseph Houston Brown, who will herein be referred to as the defendant, was convicted of manslaughter in the first degree for having killed his father, John Brown, June 8, 1920. In accordance with the verdict, April 25, 1921, he was sentenced to imprisonment in the penitentiary for a term of four years.

It appears that at the time of the homicide the defendant was 19 years of age, and for some time had lived with his brother-in-law, John Holt, whose home was about 300 yards from the home of deceased. On the day before the homicide the defendant and his father had a difficulty at his father's place; the next morning deceased followed his wife and two daughters to John Holt's home and engaged in an altercation with his wife, his daughter, Mrs. Holt, and the defendant. The defendant went around the house and came back with a shotgun and ordered his father to leave, his father refused to go, and the defendant shot him. The evidence shows that the shot went through his left arm just above the wrist, striking on the outside of the arm and entered just above the navel; death was almost instantaneous. The evidence shows that no weapon of any kind was found upon the body or near it.

Ola Brown, daughter of the deceased, and sister of the defendant, testified:

That the night before the tragedy her father and mother had some trouble. The next morning with her mother and sister Muriel she went to John Holt's, who was the husband of her sister Stella. That they were all out in the yard talking when her father came through the gate, and spoke to Stella's baby, saying, "Hello there, baby child." Then he said, "Stella, what in the hell are you doing?" He then turned to my brother and said, "Son, you must not come down there any more now; you made a hell of a break yesterday, you sure did, about saying to lay that gat down." My brother said, "Well, papa, you told me that yesterday, and I haven't been back since." My father

sat down and my brother walked away; in five or ten minutes he returned, carrying a shotgun, and told my father "to get." My father turned around, faced him, and said, "You see I ain't gone." My brother said, "Well, you will leave." My brother stood there about a minute without saying anything, he had the gun raised in the direction of father; we were all asking him not to shoot, Mamma said, "Oh, Hugh, don't shoot." We were all hollering the same thing; I thought I would pull the gun down, my brother said, "Get back," so I got back. My father put his left hand over to his right side and my brother shot him; father stumbled backwards and fell. My brother told Mamma to tell me to go to Parker's and tell somebody to come down there; she told me to go on, and I went away.

Mrs. Stella Holt testified:

"My mother, my two sisters, and my brother were at the house, my husband was out in the field. My mother had been over before breakfast, stayed a few minutes and went back home, then she came back with the girls; my brother was sitting in a chair under a tree; father came in and spoke to the baby, then he asked me, 'What in the hell are you doing?' Then he said, 'Where is John?' I said I guess he has gone to the field. Then he walked up in front of my brother and said, 'You made a hell of a break yesterday, you thought you were playing damn smart coming down there like you did.' My brother said, 'Papa, you are the cause of this, now you go on away and leave me alone.' My father said, 'Oh, hell, I will never leave you alone, if you don't get me I will get you.' Papa turned and began on mamma again, calling her a liar, and my brother went into the house. When he came back he was carrying a gun. Papa was cursing and demeaning mamma. He says, 'You tell the girls I hit you last night.' Mamma said, 'You did.' He said, 'You are a God damn liar. I didn't slap you.' Mamma said, 'Muriel, didn't he slap me,' and she said, 'Yes, mamma, he did,' and papa said, 'Muriel you are a God damn liar.' My brother was walking towards father. He said, 'You get,' and papa says 'You see I am not gone, I am not going to go.' He told papa two or three times to go, and said, 'I have asked you to go; I am going to shoot you.' Muriel and Ola said, 'Don't Hugh! Don't Hugh!' and started towards them,

and my brother said, 'Don't go in front of the gun,' and mamma said, 'Don't do that, Hugh,' and father sort of put his left hand up in front of his breast and my brother shot him. Father fell on his back; there was nothing in his hands; he was dead when I reached him.''

As witnesses for the defendant, the testimony of Mrs. Sally Brown, widow of the deceased and mother of the defendant, and Muriel Brown, daughter of the deceased and sister of the defendant, was in substance the same as the witnesses for the state, and to the further effect that the deceased had been drinking the day before his death.

John Holt, brother-in-law of the defendant, testified that the deceased came to the field the day before the tragedy and stated that he was going to get the defendant, and that at that time he was carrying a pistol; that he persuaded the deceased not to go up to the house where the defendant was; that later in the evening the deceased made threats that he was going to get the defendant.

Several witnesses testified to the good character of the defendant for peace and quietness.

As a witness in his own behalf, the defendant testified:

That the day before the tragedy he went to his father's house to get his horse. That his father abused him and slapped him, that his father had a gun on. That he was plowing in the field with John Holt. That his father came and talked to Holt. That Holt came to him and told him that his father was threatening to kill him and advised him to quit and to go to town and have his father arrested. That he quit when the sun was about an hour high, and before sundown his father came to the hog lot where John Holt was and again made threats. That the next morning his mother came to Holt's and said that her husband slapped her last night, and that she hit him on the head with a knife. That his mother went back home and a little later his mother came back with Muriel and Ola, his sisters.

That his father followed them, and when he came in he spoke to the baby, then said, "Stella, what in the hell are you doing?" Then he came over where I was sitting in a chair and says, "Son, you made a hell of a break yesterday evening, you did not do me right." I says, "I aim to do you right." He says, "I ain't going to have any more of that. You are getting too damn smart to stay at home." I says, "I didn't aim to mistreat you in any way." He says, "I told you yesterday evening that you could not come on that side of the fence any more," and I said, "I haven't been back down there." He says, "Well you want to be damn sure not to come down on that side, if you do I am going to get you." Then he turned and said, "Stella, look at me, see what your mother did to my head last night," and mother says, "I would not have done that to you if you had not slapped me," and he says, "You are a damn liar." So I rose up out of the chair. Mamma says, "Muriel, didn't he slap me first?" and Muriel says, "Yes;" and he says, "Muriel, you are a damn liar." Then I went around the house after the gun. It was sitting in the corner. There was a shell on the dresser, and I took it and put it into the gun. Then I went back around the corner of the house, my father was cussing my mother and I told him "to get." He says, "You see I ain't gone, do you?" They all says, "Don't do that, Hugh," or something like that, and I says, "Papa, you must go." "Hell," he says, "I ain't going to go." Sister Ola got in front of the gun. I told her to get away. He told me I was too damn big a coward to shoot; that I did not have the nerve to shoot, and he says, "Don't you know if you was to shoot me they would string you up before you got to town," and I says, "Papa, please go on and let us alone," and he says, "Leave you alone, hell. I am never going to leave you alone," and he done that way. That is when I shot him; he was moving toward me and I thought he was going to get a gun."

In rebuttal, F. J. Kim, court reporter, testified that he took the testimony on the preliminary examination, including that of the defendant, and read from the transcript of the defendant's testimony, in part as follows:

"Q. You had the gun directly on him? A. Yes, sir.

"Q. Didn't you tell him that you would kill him if he didn't leave? A. I says, 'Papa, I will hurt you if you don't leave.'

"Q. You could not hurt him very well unless you killed him with that gun? A. No, sir.

"Q. You did kill him? A. Yes, sir.

"Q. That is the way you was going to hurt him if he didn't leave? A. Yes, sir.

"Q. That is the way you hurt him? A. Yes, sir."

The errors assigned and argued are based upon exceptions taken to three of the instructions given, and alleged misconduct of jurors during the trial.

There is no material difference in the testimony of the several witnesses as to the facts in this case, and the only evidence of any overt act on the part of the deceased is the testimony of the defendant to the effect that when deceased raised his left arm he thought he was reaching for a gun; as against that, the testimony of all the witnesses is to the effect that they were begging the defendant not to shoot his father when he fired the fatal shot.

Our Penal Code provides that homicide is justifiable when committed by any person—

"when resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person is; or, when committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress or servant when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished." Comp. Stats. 1921, § 1754.

In order to justify the killing of a human being on the ground of self-defense, it must appear that the defendant acted under a reasonable belief that he was in imminent danger of

death or great bodily harm from the deceased. However, it is not necessary, in order to justify on the ground of self-defense, that the danger should have been real or actual, but the circumstances must be such as to create a reasonable belief in the mind of the defendant that it was necessary to kill the deceased in order to save his own life, or protect himself from great bodily harm, and in judging of the danger the circumstances must be viewed as they appeared to the defendant when he killed the deceased. Mulkey v. State, 5 Okla. Cr. 75, 113 Pac. 532.

In Roddie v. State, 19 Okla. 63, 198 Pac. 342, it is said:

"In order to justify the assault and to slay an assailant, within the meaning of this section, there must be an apparent design on the part of such assailant to either take the life of the person assailed or the infliction of some great personal injury, not necessarily amounting to a felony, if carried out, and in addition thereto there must be reasonable ground for believing that there is imminent danger of such design being accomplished. The use of a deadly weapon is justifiable for the purpose only of preventing an unlawful and violent attack on one's person, of such a nature as to produce a reasonable expectation or fear of death or great bodily injury about to be inflicted. There may be circumstances under which one violently attacked by another who is unarmed will be justified in using a deadly weapon in his defense, such as great disparity in years or one greatly his superior physically. Ordinarily the mere fact that one is approached in a threatening manner by another who is unarmed, and who is not his superior physically, will not justify him in using such a weapon. However, it is for the jury to say whether a person assaulted with hands or fists could, under the circumstances of the case, justifiably resist the assault with a deadly weapon."

Carefully considering the testimony in the case under the most favorable view that can be taken of it in favor of the defendant, we feel constrained to say that there is no room for reasonable belief that the deceased assaulted or attempted to

assault the defendant, or any other member of his family present before the fatal shot was fired.

It follows that the criticism of the instructions on the ground that they do not fully state the law of justification in self-defense is without merit. It is sufficient to say that the instructions as given by the court fully covered every phase of the case to which the testimony was applicable, including the law as to manslaughter in the first degree, as to self-defense, and as to reasonable doubt.

One of the grounds of the motion for a new trial is:

"That the court erred in allowing the jury to separate during the trial, after having ordered that the jury be kept together and not be allowed to separate."

The proof in support of this ground shows that by agreement of the parties the court permitted the bailiff to take the jurors to Sunday school during the trial of the case; that juror Herreld and another juror became separated from the other jurors at Sunday school for 10 or 15 minutes. But it was not shown that these jurors left the room.

The juror Herreld testified that he was secretary of the Sunday school and went over to his desk in the corner, which was in plain view of where the jury was sitting, and assisted in tabulating the class attendance, and that he did not converse with anybody except the Sunday school superintendent and his assistant.

In the case of Weatherholt v. State, 9 Okla. Cr. 161, 131 Pac. 185, this court held:

"The fact that a juror in a capital case became separated from his fellow jurors at a recess during the trial, and left the custody of the officers who had the jury in charge, is not sufficient ground to grant a new trial; where it does not appear that he had any communication with any one concerning the

cause, either directly or by conversation, or indirectly, by over-hearing the observations of others, or that he did any act inconsistent with his duty as a juror during such separation."

Upon the record before us it clearly appears that the defendant suffered no injury by reason of the alleged separation of the jury.

We have examined the other assignments of error and find none of them having sufficient merit to warrant any further discussion. In our view, the jury were exceedingly lenient under the circumstances in assessing the minimum punishment. As shown by the record, the defendant has had a fair and impartial trial. The judgment of the lower court is accordingly affirmed.

MATSON, P. J., and BESSEY, J., concur.