**Donna Lee BECHTEL, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–88–887.**

Court of Criminal Appeals of Oklahoma.

Sept. 2, 1992.

Rehearing Denied Oct. 22, 1992.

Garvin A. Isaacs, Oklahoma City, for appellant.

Robert H. Henry, Atty. Gen., Sandra D. Howard, Asst. Atty. Gen., Stephen C. Dozer, Legal Intern, Oklahoma City, for appellee.

## OPINION

JOHNSON, Judge:

DONNA LEE BECHTEL, Appellant, was retried [1] by jury for the crime of Mur-

---

**1.** Appellant previously was tried and convicted of the same offense and sentenced to life impris-

der in the First Degree in violation of 21 O.S.1981, § 701.7, in Case No. CRF-84-4550 in the District Court of Oklahoma County before the Honorable Richard L. Freeman, District Judge. The jury returned a verdict of guilty and set punishment at life imprisonment, to which she was sentenced. From this Judgment and Sentence, she has perfected her appeal to this Court. Some of her points on appeal include: 1) that the trial court erred in refusing to submit certain instructions; 2) that the court erred in refusing to allow expert testimony on the "battered woman syndrome"; 3) that the court erred in refusing to admit specific instances of the victim's conduct into evidence; and 4) judicial and prosecutorial misconduct.

## FACTS

The following facts are primarily from the testimony of the Appellant who met the victim, Ken Bechtel, in June 1981. At that time he was married, but separated, and dating another woman with whom he had been living for seven years. Appellant saw him approximately five times after their first meeting but did not start seeing him on a regular basis until he got his divorce. They were married on August 25, 1982. Although there was great conflict between her testimony and that as presented by the State, most of the balance of the facts are as presented by Appellant. We are presenting her testimony to show facts necessary to meet the first prong of our guidelines under the Battered Woman Syndrome.

She recalled that the first incidence of violence perpetrated by the victim upon her was on July 4, 1982, when around midnight, he began crying about his deceased son and, in a drunken rage, grabbed her by the head and threw her into the windshield of his boat. As she tried to get to the telephone, he started to throw canned goods out of the closet at her. She left but was caught and put in a car by Ken; while they were stopped at a stop sign, she jumped out of the car. Mr. Bechtel came around the side of the car, threw her back in, and told her not to ever do that again. Inside the car, he grabbed her head by the hair and slammed her into the window and again, told her not to get out of the car. When they arrived at her home, Appellant jumped out of the car, ran into her house and locked the doors. When Ken Bechtel threatened to kick the "m ... f ..." door in, Appellant responded by telling him that she had guns in her home. Mr. Bechtel eventually left. This was the first of approximately 23 battering incidents leading to the fatal shooting on September 23, 1984.

Testimony at trial revealed that the deceased committed the batterings when intoxicated and without provocation. The batterings consisted of the deceased grabbing Appellant by either her ears or hair and pounding her head on the ground, wall, door, cabinet or other available object. During many of the episodes he would sob profusely and ramble about his deceased son who was born retarded. During all of the episodes, the deceased threatened or otherwise intimidated Appellant.[2]

On three occasions, Appellant was treated in the Emergency Room. On each of the occasions, the deceased provided the information as to the cause of the injury. On one occasion, Appellant was treated for neck injury and provided with a neck collar. On the other occasions, she was treated for cuts to her hand and feet. On five occasions, Appellant sought police help. Each time the police arrived at her home, the deceased was made to leave. On one occasion, Appellant stopped at the scene of an accident and asked the policeman at the scene to remove the deceased who, in a drunken rage, was kicking the windshield and beating on the dashboard. The de-

onment. This Court reversed and remanded in *Bechtel v. State,* 738 P.2d 559 (Okl.Cr.1987).

**2.** We point out that Appellant was severely limited in her defense due to the trial court's refusal to allow her to relate any threats by the deceased or any conversations of whatever na-

ture, which were necessary to explain or otherwise put into perspective the various relevant incidents. We address this problem below under Hearsay and the Battered Woman Syndrome.

ceased was removed and taken to the residence and was there when Appellant arrived. Appellant was subsequently beaten by the deceased.

On several occasions, Appellant was able to escape her residence and stay overnight at various hotels. Appellant related the incidents to some of her close friends and the deceased's family. However, though some of the abuse occurred on business trips, she never told the deceased's business associates. Appellant also sought help from the deceased's family as to his alcohol problem. She made inquiries of several treatment facilities and made appointments for the deceased, who promised after later incidents to undergo treatment, but never did.

On September 23, 1984, the day of his death, the deceased returned home unexpectedly at approximately 5:30 A.M. from a hunting trip, highly intoxicated. He awakened Appellant and ordered her to get out of the bed so they could have a drink. He ordered her out on the patio where the deceased related to her and her friend, Billy Bender, who was visiting from out of state, that he had been picked up for driving under the influence by the Nichols Hills Police. Ken Bechtel continued to drink coffee with liquor. He became angry when Appellant kept turning down the jukebox whenever he would turn it up.

After about three or four hours, Appellant decided to go back to bed. Once in her bedroom, she could hear Mr. Bechtel crying. She became afraid. Aware that Ms. Bender might be in difficulty, she went to the doors of the patio to try to get Ms. Bender's attention. Finally, Ms. Bender came inside to get some cigarettes. When she tried to return to the patio, Appellant admonished her not to go back but to leave Mr. Bechtel alone to sleep it off and for her to go to bed immediately. The next thing Appellant remembered was hearing the night table drawer opening and seeing the deceased with the .25 gun in his hand. He told Appellant that she would not need that G.. D.. gun anymore.

As he walked towards the door leading to the backyard, she jumped up and ran to the closet where she frantically looked for her purse and keys. After retrieving her purse, she turned to go to the kitchen when a naked Ken Bechtel pulled her by the hair and threw her back on the bed. He was rambling and crying about his son Kenny and questioning her about why she was not at home when he tried to call her earlier. He held his arm against her throat. Appellant raised her leg to free herself when they both fell onto the floor. The deceased threatened to "f--k you and kill your ass." He began pounding her head into the floor. He picked her up by the head and pulled her back on the bed. He pulled her gown off and rammed his fingers into her vagina. He then climbed on top of her, held her down by placing his knees on her arms and banged her head against the headboard. He ejaculated on her face and stomach, after which he slumped on top of her. She eased from under him and went to the bathroom to wash herself.

While in the bathroom, the deceased came up behind her, grabbed the back of her head, threw her down on the floor, bit her on the left breast and finally lay his head on her lower body. During this time, Appellant tried to calm him down by repeating it's okay, it's all right. Then the telephone rang. It was a friend inquiring about his luggage. During this time, Appellant vomited. As she was trying to put on some clothes, Ken returned, accusing her of taking the friend's luggage and betting that she thought it was her "G.D." kids. He put her arm behind her back and his arm against her throat and forced her back onto the bed. At this point his eyes were glazed over and he was crying and rambling as he continued to beat her head against the headboard. He slumped on top of her.

Appellant tried to get from under him, but he would mumble whenever she made an effort. Finally, she eased herself from under him. As she sat on her knees on the floor beside the bed, she lit a cigarette, held it in one hand and her head with the other hand. As she got ready to smoke the cigarette, she heard a gurgling sound, looked up and saw the contorted look and

glazed eyes of the deceased with his arms raised. Appellant reached for the gun under the bed and shot the deceased as she tried to get up and run.

## SELF–DEFENSE AND THE BATTERED WOMAN

Appellant defended this case on the theory of self-defense. In Oklahoma, self-defense is the subject of statutory and case law. The relevant portions of 21 O.S. 1981, § 733 state:

> Homicide is also justifiable when committed by any person in either of the following cases: . . . . . . . . . . . . . . . . .
> 2. When committed in the lawful defense of such person, . . . . . . . ., when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished; . . . .

This Court has held that the bare belief that one is about to suffer death or great personal injury will not, in itself, justify taking the life of his adversary. There must exist *reasonable* grounds for such belief at the time of the killing. (Emphasis added). Further, the right to take another's life in self-defense is not to be tested by the honesty or good faith of the defendant's belief in the necessity of the killing, but by the fact whether he had reasonable grounds for such belief. (Emphasis added). *See Hood v. State*, 106 P.2d 271 (Okl. Cr.1940). Fear alone never justifies one person to take the life of another. Such fear must have been induced by some overt act, gesture or word spoken by the deceased at the time the homicide occurred which would form a *reasonable* ground for the belief that the accused is about to suffer death or great bodily harm. *McKee v. State*, 372 P.2d 243 (Okl.Cr.1962); *West v. State*, 617 P.2d 1362, 1366 (Okl.Cr.1980).

3. We note that the standards for evaluating the state of scientific knowledge in an area only require that the expert's *methodology* be *generally* accepted by the *relevant* scientific community, not that it be accepted unanimously or that the results of the methodology are infallible. Any disagreements about the specific methodol-

For the purposes of deciding this appeal, we analyze two of the requirements of self-defense: (1) *reasonableness* and (2) *imminence*. These two requirements, as applied to this case, can be understood only within the framework of the Battered Woman Syndrome.

## 1. ADMISSIBILITY OF TESTIMONY AS IT RELATES TO THE BATTERED WOMAN SYNDROME

On appeal, Appellant contends that the trial court erred in refusing to allow expert testimony on the battered woman syndrome as such testimony would aid the trier of fact in assessing how her experiences as a battered woman affected her state of mind at the time of the killing. This, she argues, goes to the *reasonableness* of her belief that she was in *imminent* danger. We agree.

An offer of proof concerning the admissibility of testimony on the Battered Woman Syndrome was made in-camera where the trial judge heard testimony from Dr. Lenore Walker, a licensed, practicing psychologist and diplomate in clinical psychology who pioneered the research on the Battered Woman Syndrome, and the State's witness, Dr. Herbert C. Modlin, a licensed, practicing psychiatrist. Dr. Walker discussed the methodology used by her in diagnosing such syndrome and related that this is taught in the graduate schools and accepted in the entire scientific community of research.[3] On refusing to allow the testimony, the trial judge offered the following three reasons:

> 1. The lack of general acceptance of the theory in the psychological community based on the fact that the syndrome is not listed in the *Diagnostic and Statistical Manual of Mental Disorders–3–R* (DMS–3R), a publication of the American Psychiatric Association.

ogy used or the accuracy of the expert's conclusions are left to the trier of fact, who will determine the weight to be given the expert's testimony. Additionally, the opposing party is given the opportunity to challenge and to rebut the expert's testimony and to present its own expert witness.

2. The testimony did not appear to be necessary or helpful to the jury since the jury was capable of making a decision based on all of the evidence.

3. The lapse of time between the incident and the psychological testing, which "would certainly permit time for manufacturing of a defense or for the healing of whatever emotional and personality abnormalities or wounds had been caused by the relationship."

We find no support for the trial court's first reason.[4] The relevant scientific community in this case is the psychological community and not the psychiatric community. Moreover, both experts acknowledged that the syndrome is considered a sub-category of Post-traumatic Stress Disorder, which is generally accepted and is listed in the DSM–3R. Based upon our independent review of the available sources on the subject, we believe that the syndrome is a mixture of both psychological and physiological symptoms but is not a mental disease in the context of insanity. Further, we believe that because psychologists see more battered women than psychiatrists, the psychological community has had the opportunity to be and, indeed, have been more responsive to the problems or symptoms experienced by those suffering from the syndrome.

Other courts have accepted the syndrome as a scientifically recognized theory.[5] To date, thirty-one (31) states and the District of Columbia allow the use of expert testimony on the subject. Five (5) states acknowledged its validity, but held the testimony inadmissible based on the facts of the particular case.[6] In addition, hundreds of books, articles and commentaries have been written and numerous studies have been done on the subject.[7] Based on the

**4.** The American Psychological Association, representing more than 55,000 psychologists, endorsed expert testimony on the syndrome in its *Amicus Brief of the American Psychological Association, Hawthorne v. State,* 408 So.2d 801 (Fla.Dist.Ct.App.1982) (No. VV–307).

**5.** *Ex parte Hill,* 507 So.2d 558 (Ala.1987); *People v. Aris,* 215 Cal.App.3d 1178, 264 Cal.Rptr. 167 (1989); *People v. Hare,* 782 P.2d 831 (Colo.1989); *Hawthorne v. State,* 470 So.2d 770 (Fla.Dist.Ct.App.1985); *Borders v. State,* 433 So.2d 1325 (Fla.Dist.Ct.App.1983); *Terry v. State,* 467 So.2d 761 (Fla.Dist.Ct.App.1985); *Smith v. State,* 247 Ga. 612, 277 S.E.2d 678 (1981); *Chapman v. State,* 258 Ga. 214, 367 S.E.2d 541 (1988); *Motes v. State,* 192 Ga.App. 302, 384 S.E.2d 463 (1989); *People v. Minnis,* 118 Ill.App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209 (1983); *State v. Nunn,* 356 N.W.2d 601 (Iowa App.1984); *State v. Hundley,* 236 Kan. 461, 693 P.2d 475 (1985); *State v. Hodges,* 239 Kan. 63, 716 P.2d 563 (1986); *State v. Stewart,* 243 Kan. 639, 763 P.2d 572 (1988), Sleeping husband case; *State v. Dunn,* 243 Kan. 414, 758 P.2d 718 (1988); *State v. Clements,* 244 Kan. 411, 770 P.2d 447 (1989); *Commonwealth v. Rose,* 725 S.W.2d 588 (Ky.1987); *Commonwealth v. Craig,* 783 S.W.2d 387 (Ky.1990); *State v. Burton,* 464 So.2d 421 (La.App.1985); *State v. Anaya,* 438 A.2d 892 (Me.1981); *Commonwealth v. Moore,* 25 Mass.App.Ct. 63, 514 N.E.2d 1342 (1987); *State v. Hennum,* 441 N.W.2d 793 (1989), Sleeping husband case; *State v. Clay,* 779 S.W.2d 673 (Mo.App.1989); *State v. Anderson,* 785 S.W.2d 596 (Mo.App.1990); *State v. Williams,* 787 S.W.2d 308 (Mo.App.1990); Missouri Statute: § 563.0333, RSMo. Supp.1988; *May v. State,* 460 So.2d 778 (Miss.1984); *State v. Jackson,* 231 Neb. 207, 435 N.W.2d 893 (1989); *State v. Briand,* 130 N.H. 650, 547 A.2d 235 (1985); *State v. Kelly,* 97 N.J. 178, 478 A.2d 364 (1984); *State v. Gallegos,* 104 N.M. 247, 719 P.2d 1268 (1986); *People v. Torres,* 128 Misc.2d 129, 488 N.Y.S.2d 358 (N.Y.Sup.1985); *State v. Clark,* 324 N.C. 146, 377 S.E.2d 54 (1989); *State v. Norman,* 324 N.C. 253, 378 S.E.2d 8 (1989), Sleeping husband case; *State v. Leidholm,* 334 N.W.2d 811 (N.D.1983), Sleeping husband case; *State v. Koss,* 49 Ohio St.3d 213, 551 N.E.2d 970 (1990), overruled *State v. Thomas,* 66 Ohio St.2d 518, 423 N.E.2d 137 (1981); *Commonwealth v. Stonehouse,* 521 Pa. 41, 555 A.2d 772 (1989); *State v. Hill,* 287 S.C. 398, 339 S.E.2d 121 (1986); *State v. Devita,* 1989 WL 34130 (Tenn.Cr.App. 1989); *State v. Furlough,* 797 S.W.2d 631 (Tenn. Cr.App.1990); *Fielder v. State,* 756 S.W.2d 309 (Tex.1988); *Blair v. Blair,* 154 Vt. 201, 575 A.2d 191 (1990); *State v. Allery,* 101 Wash.2d 591, 682 P.2d 312 (1984); *State v. Ciskie,* 110 Wash.2d 263, 751 P.2d 1165 (1988); *State v. Hanson,* 58 Wash.App. 504, 793 P.2d 1001 (1990); *State v. Dozier,* 163 W.Va. 192, 255 S.E.2d 552 (1979); *State v. Lambert,* 173 W.Va. 60, 312 S.E.2d 31 (1984); *State v. Steele,* 178 W.Va. 330, 359 S.E.2d 558 (1987); *State v. Duell,* 175 W.Va. 233, 332 S.E.2d 246 (1985); *State v. Felton,* 110 Wis.2d 485, 329 N.W.2d 161 (1983).

**6.** *Fultz v. State,* 439 N.E.2d 659 (Ind.1982); *State v. Dannels,* 226 Mont. 80, 734 P.2d 188 (1987); *Larson v. State,* 104 Nev. 691, 766 P.2d 261 (1988); *State v. Moore,* 72 Or.App. 454, 695 P.2d 985 (1983); *Buhrle v. State,* 627 P.2d 1374 (Wyo. 1981).

**7.** A sample includes: "A Killing Excuse", *Time,* November 28, 1977 at 108; "The Right To Kill",

8

aforesaid, we find that the Battered Woman Syndrome is a substantially scientifically accepted theory.

■ We next address the trial court's ruling that expert testimony does not appear to be necessary or helpful to the jury since Appellant's testimony concerning numerous drunken assaults and threats, including the vicious assault and threat to kill her on the night of the homicide, are, in the trial court's opinion, "easily within the common understanding of all the jurors and easily come[s] within the legal definition of self-defense. The jury may consider all the rest of the evidence offered and yet to be offered in conjunction with the Defendant's statement of the incident, and they can make the decision." We do not agree, especially in light of the two inquiries submitted by the jury during its deliberation (See footnote 14 and "Instructions on Burden of Proof in Self–Defense"). These inquiries demonstrate the lack of common understanding of the elements of self-defense, particularly where the defendant is a battered woman.

Expert testimony in Oklahoma is admissible if it will assist the trier of fact in search of the truth and augment the normal experience of the juror by helping him or her draw proper conclusions concerning particular behavior of a victim in a particular circumstance or circumstances. *See Davenport v. State*, 806 P.2d 655 (Okl.Cr. 1991), where this Court allowed expert testimony concerning the "Child Accommodation Syndrome." 12 O.S.1981, § 2702 provides: "If scientific, technical or **other specialized knowledge** will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise." (Emphasis added).

Appellant argues that expert testimony regarding the syndrome is admissible to help the jury understand the battered woman, and, why Appellant acted out of a reasonable belief that she was in imminent danger when considering the issue of self-defense. We agree.

While the Court does not, as a matter of law, adopt the definition of a "Battered Woman", it was first defined by Dr. Lenore Walker in her book, *The Battered Woman Syndrome* (1979), as follows:

The battered woman is a woman who is repeatedly subjected to any forceful, physical or psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights. Battered women include wives or women in any form of intimate relationship with men. Furthermore, in order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman. Id. at XV.

Misconceptions regarding battered women abound, making it more likely than not that the average juror will draw from his or her own experience or common myths, which may lead to a wholly incorrect conclusion. Thus, we believe that expert testimony on the syndrome is necessary to counter these misconceptions.[8]

*Newsweek*, September 1, 1975 at 69; Langley & Levy, *Wife Beating: The Silent Crisis 12*, E.P. Dutton, 1977; Ewing, *Battered Women Who Kill* (1987); Browne, *When Battered Women Kill* (1987); Rosen, *Battered Wives: A Comprehensive Annotated Bibliography of Articles, Books and Statutes in the United States of America* (1988); Comment, *The Admissibility of Expert Testimony on Battered Wife Syndrome: An Evidentiary Analysis* (1982), 77 N.W.U.L.Rev. 348; Schneider, *Describing and Changing; Women's Self–Defense Work and the Problem of Expert Testimony on Battering* (1986), 9 Women's Rights L.Rptr. 195.

8. Dr. Walker writes: "Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at anytime. The expert evidence would counter any 'common sense' conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage." *The Battered Woman Syndrome* (1979).

■ We next address the trial court's third reason for not allowing the expert testimony, i.e., that the 3½ years lapse of time between the commission of the offense and the psychological examination would allow for the manufacturing of a defense. Both the trial judge and the State, in support of said reason, rely on *McKee v. State*, 372 P.2d 243 (Okl.Cr.1962) and *Jones v. State*, Okl.Cr., 542 P.2d 1316. In *McKee*, this Court held that the trial court properly rejected defendant's offer of expert testimony that she was motivated by mental apprehension of fear in slaying her husband. We stated:

> The state of mind of the accused is the proper subject for expert testimony when the defense is based on a plea of insanity at the time of commission of the act, but it is not a proper subject for expert testimony when the defense is not based on a plea of insanity at the time of commission of the act for which the defendant stands accused.

In the *McKee* case, this Court's concern clearly had to do with an expert testifying as to the ultimate issue, i.e., *whether or not the accused acted in necessary self defense,* and not the thirty days lapse of time between the offense and the examination.

In *Jones, supra,* the expert testimony sought to be admitted was based on an examination conducted eight months after the commission of the crime. The defendant's examination by his expert consisted of one interview where he was placed under hypnosis. The defendant sought to have admitted his exculpatory declarations while in hypnosis together with the expert witness' opinion of the defendant's truthfulness in making those assertions. The Court recognized that truth serum or hypnosis may be employed as an accepted analytical tool in psychological or psychiatric evaluation and diagnosis. This Court held that the defendant failed to establish proper foundation for such testimony.

■ Thus, we distinguish and clarify the decisions in *McKee* and *Jones.* Further, we hold that the lapse of time between the commission of the offense and the examination of the accused is not per se grounds to exclude evidence by the expert. The Court may not allow the expert to testify to the ultimate fact and further, must determine the reasonableness of the testimony based upon the passage of time.

■ We believe that the Battered Woman Syndrome has gained substantial scientific acceptance and will aid the trier of fact in determining facts in issue, i.e., *reasonableness* and *imminence* (discussed below), when testimony on the same is offered in cases of self-defense. However, before such testimony may be admitted, this Court today sets forth the following guidelines:

1. The defendant must offer evidence which establishes herself as a "battered woman."

2. The expert must establish herself/himself as one who is qualified by knowledge, skill, experience, training or education to diagnose the defendant as suffering from the Battered Woman Syndrome.

3. The defendant, who has submitted herself to psychological or psychiatric examination and who intends to use or otherwise rely on testimony resulting from said examination, may be ordered, at the discretion of the trial court, to submit to an examination by the State's expert witness, upon application of the State. The defendant's expert is permitted to be present and observe the examination.

4. A report of the State's expert setting forth all relevant findings, opinions, conclusions and their factual bases shall be prepared and a copy provided to the defendant forthwith. Testimony of the State's witness shall be admitted only in rebuttal on matters covered by the expert for the defense and for the same purposes for which the defense expert's testimony was offered.

5. The expert may not give an opinion on whether the defendant acted reasonably in perceiving herself as being in imminent danger and whether the defendant acted in self defense.

6. The trial court shall give in its charge to the jury the specific instruction

on standard of reasonableness, which we adopt today (see below).

 Thus, we conclude that the trial court erred in not allowing testimony on the syndrome. We find the trial court's failure to allow said testimony amounts to reversible error requiring a new trial. 12 O.S.1981, § 2104 A.2. and 20 O.S.1981, § 3001.1.

## 2. REASONABLENESS AND THE BATTERED WOMAN SYNDROME

 The key to the defense of self-defense is reasonableness. A defendant must show that she had a *reasonable* belief as to the *imminence* of great bodily harm or death and as to the force necessary to compel it. Several of the psychological symptoms that develop in one suffering from the syndrome are particularly relevant to the standard of *reasonableness* in self-defense. One such symptom is a greater sensitivity to danger which has come about because of the intimacy and history of the relationship. Dr. Walker, in her offer of proof below, explained that the abuse occurs in a cycle (The Cycle Theory), which consists of three phases. The first phase is the "tension-building" period. The second stage is the "acute-explosion" period, where the abuse takes place. The third stage is the "loving, contrition" period.

It is during the tension-building period that the battered woman develops a heightened sensitivity to any kinds of cues of distress. Thus, because of her intimate knowledge of her batterer, the battered woman perceives danger faster and more accurately as she is more acutely aware that a new or escalated violent episode is about to occur. *See Price v. State*, 1 Okl. Cr. 358, 98 P. 447 (1908), where this Court held, quoting from *Allison v. United States*, 160 U.S. 203, 16 S.Ct. 252, 40 L.Ed. 395 (1895):

What is or is not an overt demonstration of violence varies with the circumstances. Under some circumstances a slight movement may justify instant action because of reasonable apprehension of danger, under other circumstances this would not be so. And it is for the jury, and not for the judge passing upon the weight and effect of the evidence, to determine how this may be.

Indeed, considering her particular circumstances, the battered woman's perception of the situation and her belief as to the *imminence* of great bodily harm or death may be deemed *reasonable.*

During the loving, contrition period, the abuser makes amends by being loving, making promises to change and avowing that the abuse will never happen again. It is during this stage that the battered woman is being positively reinforced by her abuser. In most battering cases, this period is of the longest duration. The cultural characteristics of women influence the battered woman's belief that if she could only do something to help her abuser, then the bad part of him will go away. Thus, the battered woman learns to develop coping skills rather than escape skills and develops a "psychological paralysis" and "learned helplessness."

Thus, Dr. Walker's testimony as to how Appellant's particular experiences as a battered woman suffering from the Battered Woman Syndrome affected her perceptions of danger, its imminence, what actions were necessary to protect herself and the reasonableness of those perceptions are relevant and necessary to prove Appellant's defense of self-defense. However, it now becomes necessary to determine the standard of reasonableness against which the finder of fact must measure the accused's belief.

 Standards of reasonableness has been traditionally characterized as either "objective" or "subjective." Under the objective standard of reasonableness, the trier of fact is required to view the circumstances, surrounding the accused at the time of the use of force, from the standpoint of hypothetical reasonable person. Under the subjective standard of reasonableness, the fact finder is required to determine whether the circumstances, surrounding the accused at the time of the use of force, are sufficient to induce in the accused an honest and reasonable belief

that he/she must use force to defend himself/herself against imminent harm.

■■■ Oklahoma's standard of reasonableness may be gleaned from past decisions of this Court and is set forth in OUJI–CR 743, which reads as follows:

A person is justified in using deadly force in self-defense if that person reasonably believed that use of deadly force was necessary to protect herself from imminent danger of death or great bodily harm. Self-defense is a defense although the danger to life or personal security may not have been real, if a reasonable person, in the circumstances and from the viewpoint of the defendant, would reasonably have believed that she was in imminent danger of death or great bodily harm.

The aforesaid instruction was given in this case. While the instruction explicitly states that the fact finder should assume the viewpoint and circumstances of the defendant in assessing the reasonableness of his or her belief, i.e. subjective, it also requires the defendant's viewpoint to be that of a reasonable person, in similar circumstances and with the same perceptions, i.e., objective. Thus, Oklahoma's standard is a hybrid, combining both the objective and subjective standards. This Court has considered the issue of the clarity of this instruction on several occasions, the latest in *Goulsby v. State,* 742 P.2d 567 (Okl.Cr. 1987), where the appellant in that case argued that the reference to "if a reasonable person" make it appear to a lay jury that the defendant's viewpoint had to conform to that of a reasonable person. There, we held that the instruction correctly stated the law in Oklahoma and found it to be sufficient. *See also Adams v. State,* 70 P.2d 821, 827 (Okl.Cr.1937); *Alcorn v. State,* 56 Okl.Cr. 156, 35 P.2d 735, 739 (1934); *Turner v. State,* 4 Okl.Cr. 164, 111 P. 988, 998 (1910); *Brantley v. State,* 15 Okl.Cr. 6, 175 P. 51 (1918); *Baker v. State,* 22 Okl.Cr. 224, 210 P. 292 (1922); *Jamison v. State,* 35 Okl.Cr. 302, 250 P. 548 (1926); *Guthrie v. State,* 87 Okl.Cr. 112, 194 P.2d 895, 901 (1948); *Haines v. State,* 275 P.2d 347, 354 (Okl.Cr.1954).

However, in light of the jury's inquiry [9] and our decision today to allow testimony on the Battered Woman Syndrome [10] in appropriate cases, we deem it necessary to modify OUJI–CR 743 by striking the words "reasonably" and "reasonable" from such instruction. We hereby adopt a new OUJI–CR 743A instruction that will be given in all Battered Woman Syndrome cases. Such modified instruction shall read as follows:

A person is justified in using deadly force in self-defense if that person believed that use of deadly force was necessary to protect herself from imminent danger of death or great bodily harm. Self-defense is a defense although the danger to life or personal security may not have been real, if a person, in the circumstances and from the viewpoint of the defendant, would reasonably have believed that she was in imminent danger of death or great bodily harm.

The Court is aware that the last session of the Legislature passed House Bill No. 2273 which added a new section to Title 22 known as Section 40.7. Such statute is to become effective September 1, 1992. It was passed by the Legislature and signed by the Governor on May 1, 1992. While we are not passing on the validity or constitutionality of such statute by this opinion, we do not believe the statute to be in conflict with this opinion. We feel that the statute and the opinion should be used together in the Battered Woman Syndrome case.

### 3. IMMINENCE AND THE BATTERED WOMAN SYNDROME

■■■ In addition to the reasonableness standard, Oklahoma's law of self-defense also imposes the temporal requirement of *imminence.* The thinking is that it is un-

---

9. See inquiry set out below under "Instructions on Burden of Proof in Self–Defense."

10. Under our present instructions, a fact finder conceivably may ponder whether the battered woman's perception should be viewed from the standpoint of a reasonable person in the circumstances of the battered woman or from the standpoint of a reasonable battered woman.

reasonable to be provoked to the point of killing well after the provocative or assertive conduct has occurred.

Furthermore, the syndrome has been analogized to the classic hostage situation in that the battered woman lives under long-term, life-threatening conditions in constant fear of another eruption of violence. *See* W. LaFave & A. Scott, *Criminal Law* 458 (2d ed. 1986) and P. Robinson, *2 Criminal Law Defenses* (1984). Robinson gives the example where the captor tells the hostage that he intends to kill him in three days. If on the first day, the hostage sees an opportunity to kill the captor and avoid the threat of his own death, a literal application of the requirement that the threat be "imminent" would prevent the hostage from using deadly force until the captor is standing over him with a knife. For the battered woman, if there is no escape or sense of safety, then the next attack, which could be fatal or cause serious bodily harm, is imminent. Based on the traditionally accepted definition of imminent and its functional derivatives [11], a battered woman, to whom the threat of serious bodily harm or death is always imminent [12], would be precluded from asserting the defense of self-defense.

▮ Under our "hybrid" reasonableness standard, the meaning of *imminent* must necessarily envelope the battered woman's perceptions based on all the facts and circumstances of his or her relationship with the victim. In *Women's Self-defense*

*Cases: Theory and Practice* (1981), Elizabeth Bochnak writes:

> The battered woman learns to recognize the small signs that precede periods of escalated violence. She learns to distinguish subtle changes in tone of voice, facial expression, and levels of danger. She is in a position to know, perhaps with greater certainty than someone attacked by a stranger, that the batterer's threat is real and will be acted upon.

Thus, according to the author, an abused woman may kill her mate during the period of threat that precedes a violent incident, right before the violence escalates to the more dangerous levels of an acute battering episode. Or, she may take action against him during a lull in an assaultive incident, or after it has culminated, in an effort to prevent a recurrence of the violence.[13] And so, the issue is not whether the danger was in *fact* imminent, but whether, given the circumstances as she perceived them, the defendant's *belief was reasonable that the danger was imminent.*

▮ Because there is the presumption in *imminence* that the defender may find an alternative to the use of deadly force, we find it necessary to address the duty to retreat, which duty is implicit in said presumption. Additionally, Appellant complained that the trial court refused to give her requested instructions on "no duty to retreat" but gave instead OUJI–CR 748.[14]

---

11. *Black's Law Dictionary,* 5th ed. 1979, defines as follows:
 "**IMMINENT.** Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous."
 "**IMMINENT DANGER.** In relation to homicide in self-defense, this term means immediate danger, such as must be instantly met, such as cannot be guarded against by calling for the assistance of others or the protection of the law. Or, as otherwise defined, such an appearance of threatened and impending injury as would put a reasonable and prudent man to his instant defense."
 *Webster's Third International Dictionary, Unabridged,* (1986), defines as follows:
 "**IMMINENT.** ... impending; hanging threateningly over one's head; menacingly near...."
 OUJI–CR 752 defines:

IMMINENT DANGER: DANGER THAT IS PRESSING, URGENT, OR IMMEDIATE.

12. See Eber, *The Battered Wife's Dilemma: To Kill or To Be Killed,* 32 Hastings L.J. 895 (1981): "[T]he battered wife is constantly in a heightened state of terror because she is certain that one day her husband will kill her during the course of a beating.... Thus from the perspective of the battered wife, the danger is constantly 'immediate.'"

13. See Thyfault, *Self-defense: Battered woman syndrome on trial, California Western Law Review,* 20, 493 notes 84 and 85.

14. The OUJI–CR 748 given reads: A person who was not the aggressor or who did not provoke another with intent to cause an altercation has no duty to retreat, but may stand firm and use the right of self-defense. Appellant's requested

The law in Oklahoma is well settled: *There is no duty to retreat if one is threatened with bodily harm. Fowler v. State*, 8 Okl. Cr. 130, 126 P. 831 (1912); *Neal v. State*, 597 P.2d 334, 337 (Okl.Cr.1979). Where a person is in a place he has a right to be, and is not the aggressor in bringing on the conflict, and is assaulted by another person in such a way as to place him in danger of death or great bodily harm, the person thus assaulted is not bound to retreat, but, on the contrary, may stand his ground, and repel the danger in which he is placed with such force as will repel the attack, and protect his person from great bodily harm; and when it is necessary to protect himself from receiving a deadly assault, or from receiving great bodily harm, even to take the life of his assailant. *Mahaffey v. Territory*, 11 Okl. 213, 66 P. 342 (1901); *See also Turner v. State*, 4 Okl.Cr. 164, 111 P. 988 (1910). Therefore, we find that OUJI–CR 748 adequately states the law in Oklahoma and the trial court did not err in refusing to give Appellant's requested instruction. We are mindful of the jury's inquiry (See footnote 14 and feel that our new instruction on standard of reasonableness will address the issue of imminence.

## 4. HEARSAY AND THE BATTERED WOMAN SYNDROME

██ The trial of this case was replete with objections based upon the Hearsay Rule.[15] Appellant attempted to offer testimony probative of the reasonableness of her apprehension of fear of the deceased. In so doing, she sought to introduce evidence of the deceased's violent propensities and past acts of aggression against her and third persons, including oral statements made by the deceased. However, the trial court sustained every objection made by the State where Appellant attempted to relate the deceased's actual statements of threats or declarations. Both the State and the trial court grossly misapplied the hearsay rule despite the fact that Appellant presented well-founded legal argument and support at nearly every opportune time. The State and the trial court took the position that Appellant was limited to giving a summary description of the deceased's acts and a description of the impact that his acts or words has on her and that any testimony consisting of any out-of-court statement is hearsay. We disagree.

We have reviewed the record herein and have found that most, if not all, of the out-of-court statements which Appellant was attempting to offer were not hearsay. Hearsay is defined by Section 2801 of Title 12 of the Oklahoma Statutes. An out-of-court statement that is hearsay is a statement that is offered to prove the truth of something asserted in the statement itself.

██ A defendant, in a self-defense case involving the syndrome, in order to establish her "fear" at the time of the commission of the offense and to establish the deceased as the aggressor, must be entitled to produce past violent encounters with the deceased and to introduce evidence of the turbulent and dangerous character or reputation of the deceased. This is an established method of proof in self-defense cases, because the law recognizes the fact that future conduct may be reasonably inferred from past conduct. *See Roberson v. State*, 91 Okl.Cr. 217, 218 P.2d 414 (1950). Justice would not be served to hold that a defendant is limited to relating the physical

---

instruction reads: "In the law if Donna Lee Bechtel actually believed and had reasonable grounds to believe that she was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, she was not required to retreat or consider whether she could retreat safely. No woman is required to leave her home to avoid an attack, even if the attacker is another member of the same household. A woman is entitled to stand her ground and use such force as is reasonably necessary under the circumstances to protect herself from serious bodily harm."

We note that the jury sent back the following inquiry regarding OUJI–CR 748: "Does this mean an active confrontation must be taking place at the time, i.e. fighting or bickering at the time?" The trial court responded: "You have everything before you that you are permitted to have."

**15.** A total of 165 objections were raised by the State: 92 were made during the testimony of Appellant while 46 were made during the testimony of other defense witnesses.

act of past conduct without its accompanying words.

■ Inherent in self-defense cases involving the Battered Woman Syndrome, are issues involving both the state of mind of the deceased and the defendant. An out-of-court statement, regardless of its truth, may imply intention, knowledge, physical or emotional feeling, or other state of mind of the deceased declarant. If offered to prove such state of mind, the statement is not hearsay. An out-of-court statement, regardless of the truth, which elicits a state of mind *in another person* in consequence of the utterance is not hearsay.[16] Such statements are circumstantial evidence and are recognized by the courts as such. We do not imply that said statements are to be admitted automatically. The trial judge may exercise his discretion to determine whether the inference sought to be drawn from the particular statement is reasonable and relevant. If not, the statement may be excluded for the lack of relevance, not on the ground of hearsay.

### INSTRUCTIONS ON BURDEN OF PROOF IN SELF-DEFENSE

■ Appellant contends that the trial court erred when it refused to instruct the jury on the burden of proof in self-defense cases in accordance with OUJI–CR 745, which reads as follows:

IT IS THE BURDEN OF THE STATE TO PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT WAS NOT ACTING IN SELF–DEFENSE. IF YOU FIND THAT THE STATE HAS FAILED TO SUSTAIN THAT BURDEN, THEN THE DEFENDANT MUST BE FOUND NOT GUILTY.

We agree. *See Perez v. State,* 798 P.2d 639 (Okl.Cr.1990) where this Court held:

This objective standard of review replaces our earlier subjective appellate review. This new standard is not only consistent with our established rule that the State has the burden of proof to show that the defendant did not act in self defense, once the defense has been raised, but will also ensure that the jury does not perceive otherwise.

Accordingly, in the retrial of this case, OUJI–CR 745 must be given in conjunction with the other appropriate self-defense instructions.

■ OUJI–CR 746, as modified, (Instruction No. 14)[17] was given to the jury in this case. Appellant objected to the giving of the modified instruction and argued that it was not applicable to this case, where there was no evidence that Appellant was the aggressor or provoked the altercation or voluntarily entered into mutual combat. The State argued that you have to give the entire self-defense series of instructions and that the instruction in question was applicable since Appellant testified that it was "necessary" for her to shoot the victim. The trial judge reasoned that since Appellant could not be hurt by the inclusion but, on the contrary, be benefitted by it, he would leave it in. For obvious and apparent reason, we agree with Appellant. Additionally, we believe that the instruction in question served to confuse the jury who submitted the following inquiry:

"Self-defense is permitted a person solely because of necessity.

---

**16.** This principle of law is expressed in *VI Wigmore on Evidence* (Chadbourn Revision) § 1789 as follows:

Whenever an utterance is offered to evidence the **state of mind** which ensued **in another person** in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned.

**17.** Said instruction is as follows:

Self-defense is permitted a person solely because of necessity. Self-defense is not available to a person who was the aggressor, no matter how great the danger to personal security became during the altercation.

OUJI–746 reads:

Self-defense is permitted a person solely because of necessity. Self-defense is not available to a person who [was the aggressor] [provoked another with intent to cause the altercation] [voluntarily entered into mutual combat], no matter how great the danger to personal security became during the altercation unless the right of self-defense is reestablished.

(1) Does this mean or imply when no other options are available; or from

(2) Defendant's viewpoint & circumstances."

The attorneys consulted and the court returned a note saying: "With respect to your question concerning Instruction number 14: You have everything before you that you are permitted to have." Appellant objected to the aforesaid response and made a record requesting another instruction.

For the foregoing reasons, this case is REVERSED and REMANDED for a new trial, consistent with this opinion.

LANE, P.J., and BRETT, J., concur.

PARKS, J., concurs in result.

LUMPKIN, V.P.J., dissents.

PARKS, Judge, concurring in results:

I find that evidence concerning Battered Woman Syndrome was relevant to the jury's assessment of appellant's theory of the case—self defense. While I conclude that the syndrome should have been presented to the jury in this case, I disagree with the majority's decision to radically overhaul the laws pertaining to self defense. The facts asserted by appellant, that the victim made a threatening movement and she shot him, constitute classic self defense and do not necessitate the sweeping changes imposed by the majority. Our inquiry should be limited to an assessment of the syndrome's reliability and its relevance to the facts presented.

I find that appellant sufficiently demonstrated the syndrome's acceptance in the concerned scientific community during *in camera* hearings. Further, I find that evidence pertaining to the syndrome could have assisted the jury in determining whether appellant "reasonably and in good faith believed that she was in danger of loosing her life or receiving great bodily injury at the hands of the deceased." (Instruction No. 29, O.R. 1045). The syndrome was pertinent to the jury's determination of whether a reasonable person, from the viewpoint of appellant, would have reacted as appellant did.

Allowing the jury to consider the circumstances from appellant's viewpoint in assessing reasonableness is not a novel concept and does not require the adoption of the standard of reasonableness set forth by the majority. *See Guthrie v. State*, 87 Okl.Cr. 112, 194 P.2d 895 (1948) (Jury was correctly instructed that they must place themselves in the defendant's situation and view the circumstances as they reasonably appeared to defendant); *Murphy v. State*, 72 Okl.Cr. 1, 112 P.2d 438 (1941) (Defendant's guilt turns upon the circumstances as they appeared to him); *Lary v. State*, 50 Okl.Cr. 111, 296 P. 512 (1931) (The act of the defendant in slaying the deceased is to be viewed from his standpoint, as the circumstances at the time reasonably applied to him); *Fulton v. State*, 36 Okl.Cr. 358, 254 P. 761 (1927) (Self defense requires a reasonable man, situated as the defendant was, seeing what he saw and knowing what he knew, to believe himself in danger). *Jamison v. State*, 35 Okl.Cr. 302, 250 P. 548 (1926) (Circumstances and appearances relied upon as creating an apprehension of danger must be viewed from the defendant's standpoint and be sufficient to cause the defendant, situated as he was, as a reasonable person, an apprehension of danger); *Brown v. State*, 24 Okl.Cr. 161, 216 P. 944 (1923) (In determining whether homicide was justified, circumstances must be viewed as they appeared to the defendant when he killed the deceased).

Currently, the jury is asked to view the circumstances as they appeared to the defendant and then is asked to determine whether a reasonable person, caught in the dynamics of those identical circumstances, would respond as the defendant did. I find that the syndrome should have been admitted as it sheds light on the circumstances surrounding the altercation *as they appeared to the appellant.* The facts before us require us to decide nothing more.

I find the majority's position regarding reasonableness puzzling. After stating that "we deem it necessary to modify OUJI–CR 743 by striking the words 'rea-

sonably' and 'reasonable' from such instruction," (*Maj.* at 11) the majority nevertheless includes the reasonableness requirement in the modified instruction. (*See Maj.* at 11). Thus, to the extent that the majority has correctly identified a deficiency in the current instruction, the problem survives the majority's attempt at a cure.

I agree with the majority's conclusion that the failure of the trial court to give appellant's requested instruction concerning the burden of proof in self defense cases (*OUJI-CR* 745) was error. (*Maj.* at 14). For the sake of clarity, I add that such error, in my view, requires a new trial.

Because of the errors identified above, I concur in the result reached by the majority, that this cause should be reversed and remanded for a new trial.

LUMPKIN, Vice–Presiding Judge, dissenting:

I commend the Court regarding the extensive research which is reflected in this opinion. However, while I agree some revision regarding our application of self defense might be warranted, the facts of this case do not present the evidentiary predicate which is required to adopt the changes proposed by the Court.

Domestic violence is appalling and each member of this Court empathizes with the victims of this degrading conduct. However, our empathy and distress with the violence which affects our society cannot be substituted for a rule of law which limits the scope of appellate review to the facts presented by the case. In addition, any rule of law must be applied equally to each citizen, regardless of gender.

The facts set forth by the Court reflect only Appellants' version of the evidence in the case without addressing the great conflict of this evidence with the evidence presented by the State. However, Appellant's evidence does define and restrict the nature and scope of the defense presented in this case. This evidence does not reveal the "Battered Woman Syndrome" was implicated on the night of September 23, 1984. The facts related by Appellant only raise a case of traditional self defense based on the right of self defense to resist any attempt to murder or commit a felony upon her, or the imminent threat as perceived by Appellant due to the victims threats and actions committed that night. The "Cycle Theory" is not relevant based on the evidence. However, I recognize evidence regarding the victims past trait of character for violence, which is admissible pursuant to 12 O.S.1981, § 2404(A)(2), is relevant as it goes to Appellant's perception as a reasonable person regarding the imminence of danger of death or great bodily harm. The admissibility of this evidence does not require the adoption of the "Battered Woman Syndrome". However, the Court appears bent upon embracing a sociological issue without regard to whether the facts support the legal concept it seeks to adopt. While I have great respect for the members of this Court, I cannot join in an abdication of the rules of appellate review in order to adopt a concept not presented on the record before the Court.

If and when a record on appeal is submitted to the Court which supports consideration of whether to adopt this type of concept as a part of the jurisprudence of this State, the Court should endeavor to adopt a rule of law which would apply equally to all citizens of the State, regardless of gender, who may be placed in a like situation. To do otherwise creates not only confusion as to its applicability but also question as to its validity if subjected to equal protection analysis. It is interesting to note the Court accurately identifies that the Diagnostic and Statistical Manual of Mental Disorders–3R (DSM–3R) recognizes the Post-traumatic Stress Disorder. See DSM–3R, 309.89 Post-traumatic Stress Disorder. However, rather than adopting a gender neutral diagnostic criteria accepted by the entire scientific community, the Court seeks to adopt a gender specific syndrome which has acceptance by only a subsection of the scientific community. If this disorder is such that it warrants this Court to review the reasonableness factor regarding action taken in self defense, then it should be considered in a gender neutral context.

The information supplied to this Court reveals the Post-traumatic Stress Disorder, as does the proposed Battered Woman Syndrome, is a mixture of psychological and physiological symptoms which make it a medical issue. Psychologists do not have the medical training received by psychiatrists, therefore I cannot agree with the Court's unsupported statement that we should accept only the opinions of a subgroup of members of the psychological community as the gospel on this complex issue. This statement alone raises concern regarding the validity of the Court's determination and it creates a future problem for the Court when we are again required to determine if a proposed new "syndrome" of some type is generally accepted by the medical or scientific community.

If adoption of the proposed changes were proper in this case, I do agree that the application of the Post-traumatic Stress Disorder is most appropriately addressed within the context of self defense rather than sanity at the time of the offense. Appellant's attorney acknowledged the concept is a part of self defense during the oral argument and went further in his argument to state that there must be an imminent physical threat and delay waives the ability to raise self defense. Therefore, the Court must first look to the defense of self defense as defined by the Oklahoma Legislature in 21 O.S.1981, § 733(1), (2).

> Homicide is also justifiable when committed by any person in either of the following cases:
>
> 1. When resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person is; or
>
> 2. When committed in the lawful defense of such person, . . . ., when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished;

The fact that the Legislature has addressed the issue of self defense within our statutory framework restricts the ability of the Court to act beyond the context of the statute. In the first instance, the language of Section 733(1) is more applicable to the facts of this case than Section 733(2). However, in discussing the provisions of Section 733(2), the statute requires "imminent danger" of the threat to the person, therefore the Court cannot change that substantive element of the defense. In addition, the statute also allows the defense when there "is a reasonable ground to apprehend" the threat. It is within the Court's power and authority to interpret and determine the parameters of the application of a "reasonable ground to apprehend" and imminent threat to the person.

The Court has previously set a procedural guideline for expert testimony as it relates to the "Child Accommodation Syndrome". See *Davenport v. State*, 806 P.2d 655 (Okl.Cr.1991). The required format for the admissibility of expert testimony adopted in *Davenport* should become the standard for this Court when dealing with expert testimony regarding these types of disorders. The jury is provided the expert assistance for the limited purpose that it is required, i.e. explanation of the symptoms and character of the disorder, but leaves to the trier of fact the determination whether it applies in the case being tried. In a case which requires expert testimony regarding the Post-traumatic Stress Disorder, or any of its subparts, this format should be utilized. While the facts of this case do not provide the evidentiary predicate for the admissibility of this type of expert testimony, I agree that in a proper case, the expert testimony could be admissible to provide guidance to the jury regarding the reasonableness of a defendants perception of a threat as set forth in Section 733 or imminent danger.

As previously stated, evidence of a victims trait of character of violence is admissible under 12 O.S.1981, § 2404(A)(2). Evidence of a victims acts of violence to a defendant could be relevant if the facts of the case require the evidence to show the reasonableness of a defendant's perception of imminent danger when the acts which caused the homicide do not, standing alone, appear to present a reasonable ground to apprehend imminent danger. I agree with the Court that the standard of instruction,

and for review, should be the reasonableness of a defendant's actions as viewed by a reasonable person under the circumstances and not a generic "reasonable person". However, the trial court must first determine if this type of evidence is relevant under the fact situation presented by the case. If it is not relevant, it is not admissible.

I must also dissent to the Court's discussion of hearsay in the opinion beginning at subpart 4., Hearsay and the Battered Woman Syndrome. The Court cites the Oklahoma Evidence Code, the definition of hearsay, and states "Most, if not all, of the out-of-court statements which Appellant was attempting to offer were not hearsay". However, the Court failed to state why the statements were not hearsay. Hearsay is defined at 12 O.S.1981, § 2801. The exceptions to the Hearsay Rule are contained in Sections 2803 and 2804. This Court is required to apply the substantive law as enacted by the Oklahoma Legislature, unless we find a statute violates a constitutional provision. I do not find any argument with the constitutionality of Section 2801, therefore, we are bound by its statutory language. The Oklahoma Evidence Code was drafted to clarify the rules of evidence. The Court, in its further analysis of the hearsay issue, seeks to adopt a definition of hearsay which is not contained within the statutory language. This attempt to redefine hearsay is in direct conflict with Section 2802 and will open the floodgate of attempts to introduce inadmissible hearsay pursuant to the illusive criteria set forth by the Court.

Many more questions are raised than answered by this opinion. The Court's discussion of "reasonableness", "imminence" and "hearsay" will be the source of much litigation and error at the trial court level for several years. This Court will be forced to address these same issues repeatedly in an effort to clear the legal quagmire which will develop as we attempt to explain what was meant by the opinion's analysis. The role of this Court should be to resolve issues, not create them. We should provide answers to the trial courts, not more questions. While the goal of this opinion is noble, it departs from the traditional rules of appellate review and embarks the Court on a course through much turbulent water in the future.

Regretfully, the Court seems to disregard the evidence of the case in a reaching attempt to adopt a syndrome which is not applicable to the facts and does not comport with the requirements of being generally accepted in the scientific/medical community. While I agree that evidence of the Post-traumatic Stress Disorder, which is accepted as a standard for diagnosis in the medical community, would be relevant evidence in a proper case to provide a jury with the medical and psychological diagnostic criteria required to determine the reasonableness of a defendants actions, it is not relevant here. The appropriate resolution of the ills of society should be left to the Legislative and Executive branches of our government. This Court should restrict itself to the application of the law to the facts presented in the record. I therefore must dissent to the Court's actions in this case.